T.C. Memo. 2014-29

UNITED STATES TAX COURT

ANTONIO J. AREDE AND GILVELY COALHO AREDE, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 26753-12L.                    Filed February 20, 2014.

Antonio J. Arede and Gilvely Coalho Arede, pro se.

Erika B. Cormier, for respondent.

MEMORANDUM OPINION

BUCH, Judge:  This case was calendared for the Court's session

commencing January 6, 2014, in Boston, Massachusetts.  On November 7, 2013,

respondent filed a motion for summary judgment under Rule 121[1] along with

_____

[1]Unless otherwise indicated, all section references are to the Internal

(continued...)

**[*2]** supporting declarations. The Court ordered Mr. and Mrs. Arede to respond to respondent's motion by December 9, 2013. After receiving no response, the Court set the motion for hearing during the trial session and ordered the Aredes to appear and show cause why their case should not be dismissed for lack of prosecution. Mr. Arede appeared at the calendar call and requested that the Court decide the motion for summary judgment. He did not present further argument or evidence. After reviewing the motion we find no material issues of fact, and summary judgment for respondent is appropriate.

Background

I. Underlying Liabilities

The Aredes failed to timely file Form 1040, U.S. Individual Income Tax Return, for 2006. Respondent prepared a substitute for return and issued a notice of deficiency. The Aredes did not petition the Tax Court, and respondent assessed the deficiency and additions to tax under sections 6651(a)(1) (failure to timely file), 6651(a)(2) (failure to timely pay), and 6654(a) (failure to make estimated tax payments) in September 2010. The Aredes later filed their 2006 Form 1040,

---

[1](...continued)
Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[*3]** which respondent accepted.  On the basis of that return, respondent abated portions of the tax and additions to tax.

The Aredes failed to timely file an income tax return for 2007.  Again, respondent prepared a substitute for return and issued a notice of deficiency.  The Aredes did not petition the Tax Court, and respondent assessed the deficiency and additions to tax under sections 6651(a)(1) and (2) and 6654(a) in December 2010.  The Aredes later filed their 2007 Form 1040, which respondent accepted.  Again respondent abated portions of the tax and additions to tax in a manner consistent with the untimely return.

The Aredes failed to timely file an income tax return for 2008.  Again respondent prepared a substitute for return and issued a notice of deficiency.  The Aredes did not petition the Tax Court.  However, before respondent assessed the deficiency, the Aredes filed their 2008 Form 1040 but did not pay the tax.  Respondent accepted the return and assessed the total tax as reported as well as additions to tax under sections 6651(a)(1) and (2) and 6654(a).

The Aredes untimely filed their Form 1040 for 2009 in December 2010.  Respondent assessed the total tax reported as well as additions to tax under sections 6651(a)(1) and (2) and 6654(a).

**[*4]**  The Aredes timely filed their Form 1040 for 2010 in April 2011 but did not fully pay the reported liability.  The following month, respondent assessed the total tax reported and an addition to tax under section 6651(a)(2).

## II. Collection Actions

On July 2, 2012, respondent mailed a Notice of Intent to Levy and Notice of Your Right to a Hearing to the Aredes.  The levy notice informed the Aredes that respondent intended to collect their 2006, 2007, 2008, and 2009 liabilities through levy.  On July 6, 2012, respondent mailed the Aredes a second levy notice informing the Aredes that respondent intended to collect their 2010 liability through levy.  The liabilities for all of the years at issue totaled over $100,000.

On July 10, 2012, Mr. Arede spoke with respondent's revenue agent by phone.  During the call Mr. Arede stated that he had won the lottery in January 2012 and received a lump-sum payout of $453,000.  Mr. Arede said that he used a portion of his winnings to pay debts to the Commonwealth of Massachusetts and some business creditors.  After paying those debts, he had approximately $139,000 remaining from his payout, which was being held in an investment account.

On July 25, 2012, respondent received a check drawn on Mr. Arede's investment account for $85,000, which was to be divided amongst the Aredes' 2006, 2007, and 2008 tax liabilities.  The next day, the Aredes' representative, Mr.

[*5] Belcher, called the revenue agent and stated that the Aredes were stopping payment on the check. Thereafter, the payment for 2006, 2007, and 2008 was returned as a "bad check".

The Aredes submitted a Form 12153, Request for a Collection Due Process or Equivalent Hearing, in July 2012. On their request the Aredes checked the box for requesting an installment agreement. Respondent's Appeals officer mailed Mr. Belcher a letter scheduling a telephone conference with respect to all of the years at issue. Additionally, the Appeals officer's letter stated that in order for the IRS to consider collection alternatives, the Aredes had to provide a completed Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, and supporting documents.

Before the telephone conference Mr. Belcher sent the Appeals officer, separately, an unsigned Form 433-A with supporting documents and a formal proposal for an installment agreement with a monthly payment of $1,000 without a specified duration. The Form 433-A stated that the then-current value of the Aredes' investment account was $62,000.

On September 6, 2012, the Appeals officer held the telephone conference with Mr. Belcher. Mr. Belcher explained that Mr. Arede had gone to his local IRS office and paid $16,000 towards his 2006 and 2009 liabilities. Additionally, Mr.

**[*6]** Belcher explained that Mr. Arede was planning to liquidate his investment account to pay fully the liability from 2010, pay other liabilities, and then pay the remainder of his tax liabilities through the $1,000-per-month installment agreement. Further, Mr. Belcher informed the Appeals officer that he had made an error on the Form 433-A and that the monthly housing expense was $2,050, not $450 as was listed. The Appeals officer requested a summary of the actions taken by the Aredes through September 4 and what the Aredes were planning to do by September 12 so that he could consider the installment agreement proposal with the updated information. The Appeals officer cautioned Mr. Belcher that if he did not receive this information, he would make a decision on September 13.

After the call on September 6, Mr. Belcher sent the Appeals officer a fax stating that Mr. Arede had stopped working as a stock trader, that Mr. Arede was taking a position as a mason, and that the information in the previously submitted Form 433-A was based on Mr. Arede's new position. Mr. Belcher also stated that Mr. Arede had made four payments towards his tax liabilities from his investment account and that once the payments cleared all the money in the account was "completely divested". The fax included proof of the payments, totaling $26,721, which were divided as follows: $8,127 for the 2006 taxable year, $8,000 for the

[*7] 2007 taxable year, $6,098 for the 2009 taxable year, and $4,496 for the 2010 taxable year. The IRS received and applied the payments.

The Appeals officer called Mr. Belcher on September 10 and explained that he was confused by the statement on the Form 433-A that the investment account contained $62,000, because Mr. Belcher's fax stated that the money in the account was "completely divested" after payments totaling $26,721 had been made. Mr. Belcher stated that he would get clarification from the Aredes.

On September 19 Mr. Belcher sent the Appeals officer another fax including a recent statement from the investment account showing a balance of $552.35. That same day the Appeals officer called Mr. Belcher and told him that he could submit any additional information until September 25, after which time the Appeals officer would be issuing his decision. Mr. Belcher did not submit any additional information.

In his notes the Appeals officer wrote that because of the various changes in the financial information during the course of the Appeals process, he was not inclined to enter into an installment agreement because he doubted that there had been full disclosure. Respondent issued a Notice of Determination Concerning Collection Action under Section 6330 on October 3, 2012, characterizing the doubts about disclosure as "inconsistent financial information" and sustaining the

**[\*8]** proposed levy.  The Aredes timely petitioned this Court.  At the time the petition was filed, the Aredes lived in Massachusetts.

Discussion

I.  Summary Judgment

The purpose of summary judgment is to avoid unnecessary and expensive trials through expediting the litigation.[2]  However, summary judgment is not a substitute for trial, and it should not be invoked in proceedings where there are disputed facts.[3]  Summary judgment may be granted "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits or declarations, if any, show that there is no genuine dispute as to any material fact and that a decision may be rendered as a matter of law."[4]  The party moving for summary judgment bears the burden of demonstrating that a genuine dispute does not exist as to any material fact.[5]  Because the moving party bears this burden, any factual inferences will be treated in a manner that is

---

[2]Fla. Peach Corp. v. Commissioner, 90 T.C. 678, 681 (1988).

[3]Shiosaki v. Commissioner, 61 T.C. 861, 862 (1974).

[4]Rule 121(b).

[5]Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994).

**[\*9]** most favorable to the nonmoving party.[6]  Although the burden falls on the moving party, the nonmoving party "may not rest upon the mere allegations or denials of such party's pleading, but such party's response * * * must set forth specific facts showing that there is a genuine dispute for trial."[7]

## II.  CDP Overview

The Secretary must notify a taxpayer in writing of his or her right to request a hearing before the Secretary can levy against any property or right to property.[8] The hearings are often called collection due process, or CDP, hearings.

In a CDP hearing a taxpayer may raise any issue relevant to an unpaid tax or a proposed levy, including appropriate spousal defenses, challenges to the appropriateness of collection actions, and offers of collection alternatives.[9]  In addition a taxpayer may challenge the existence or amount of the underlying tax liability if the taxpayer did not receive a statutory notice of deficiency or did not otherwise have the opportunity to dispute the liability.[10]  While the term

---

[6]Dahlstrom v. Commissioner, 85 T.C. 812, 821 (1985).

[7]Rule 121(d).

[8]Sec. 6330(a)(1).

[9]Sec. 6330(c)(2)(A).

[10]Sec. 6330(c)(2)(B).

**[\*10]** "underlying liability" is not defined in section 6330, we have previously interpreted this term "to include any amounts owed by a taxpayer pursuant to the tax laws."[11]

Further, if a taxpayer petitions for review of a notice of determination, the Tax Court can consider only issues that were properly raised in the CDP hearing.[12] An issue is not properly raised if the taxpayer either does not request consideration or requests consideration but fails to provide evidence on the issue at the CDP hearing after being given a reasonable opportunity to do so.[13]

As always, we must apply the appropriate standard of review. If the validity of the underlying liability is properly at issue, we will review that determination de novo.[14] In contrast, where the validity of the underlying liability is not properly at issue, we will review the determination for abuse of discretion.[15] An abuse of discretion will be found where the determination was arbitrary, capricious, or

---

[11]Katz v. Commissioner, 115 T.C. 329, 339 (2000).

[12]Sec. 301.6330-1(f)(2), Q&A-F3, Proced. & Admin. Regs.

[13]Sec. 301.6330-1(f)(2), Q&A-F3, Proced. & Admin. Regs.

[14]Sego v. Commissioner, 114 T.C. 604, 610 (2000); Goza v. Commissioner, 114 T.C. 176, 181-182 (2000).

[15]Sego v. Commissioner, 114 T.C. at 610; Goza v. Commissioner, 114 T.C. at 181-182.

**[\*11]** without sound basis in fact or law.[16]  Lastly, we need not address whether we can look outside the administrative record in this case because the Aredes did not offer any evidence outside the administrative record.

The Aredes may not challenge the underlying liabilities in this proceeding. They did not raise a challenge to the underlying liabilities during their CDP hearing or in their petition.[17]  Further, they did not petition the Court after being mailed statutory notices of deficiency for three of the years, and in any event all of the liabilities (other than penalties) were self-reported.  Accordingly, we will not consider the underlying liability for any of the years at issue and will consider only whether respondent abused his discretion when evaluating the proposed installment agreement.

III.  Installment Agreement

Section 6159(a) authorizes the Secretary to enter into an installment agreement with the taxpayer if "such agreement will facilitate full or partial collection" of the liability.  An installment agreement is considered a partial payment installment agreement if the agreement will not result in full payment of

---

[16]Giamelli v. Commissioner, 129 T.C. 107, 111 (2007).

[17]See Rule 331(b)(4).

**[*12]** the liability before the expiration of the period of limitations on collection.[18]

In reviewing the Commissioner's determinations regarding collection alternatives

for abuse of discretion, "we do not conduct an independent review of whether any

collection alternative proposed by a taxpayer was acceptable or substitute our

judgment for that of the Appeals Office."[19]  Generally, it is not an abuse of

discretion where an Appeals Office employee relies on guidelines published in the

Internal Revenue Manual (IRM) when evaluating a proposed installment

agreement.[20]

The Aredes requested an installment agreement with a monthly payment of

$1,000.  This was a partial payment installment agreement because the entire

liability would not have been paid before the period of limitations expired.  In

support of their request, the Aredes provided a Form 433-A, albeit unsigned, and

supporting information.

The IRM requires the Appeals officer to evaluate a taxpayer's equity in

assets before granting a partial payment installment agreement, and in most cases,

---

[18]See sec. 6502(a).

[19]McCall v. Commissioner, T.C. Memo. 2009-75; see also Murphy v. Commissioner, 125 T.C. 301, 320 (2005), aff'd, 469 F.3d 27 (1st Cir. 2006).

[20]Maselli v. Commissioner, T.C. Memo. 2010-19; Aldridge v. Commissioner, T.C. Memo. 2009-276.

[*13] taxpayers will be required to use available assets to pay their liabilities.[21] The Appeals officer attempted to do just that, but the facts regarding the investment account kept changing. Initially, respondent was told that the Aredes had approximately $139,000 left over from their lottery winnings after other creditors had been paid. Then the Aredes sent a check for $85,000 to respondent but subsequently stopped payment on the check. The Form 433-A stated that the investment account, the repository of the lottery winnings, contained $62,000. Yet Mr. Belcher faxed the Appeals officer a document after the CDP hearing showing that after four checks totaling $26,721 had been remitted to respondent, only approximately $500 remained. The Appeals officer asked for an explanation, but Mr. Belcher provided only the final investment account statement showing the account balance. The Appeals officer extended yet another opportunity for the Aredes to provide additional information, but nothing was submitted.

Taxpayers are not entitled to unlimited time to supplement the administrative record.[22] The Aredes were given multiple opportunities to explain the discrepancies in their reported assets (specifically, their investment account) and did not avail themselves of those opportunities. As a result the Appeals officer

---

[21]Internal Revenue Manual pt. 5.14.2.1(2) (Mar. 11, 2011).

[22]Roman v. Commissioner, T.C. Memo. 2004-20.

**[*14]** could not properly evaluate the Aredes' assets and rejected the installment agreement request.

The determination by the Appeals officer must take into consideration: (1) the verification that the requirements of applicable law and administrative procedure have been met; (2) issues raised by the taxpayer; and (3) whether any proposed collection action balances the need for efficient collection with the legitimate concern of the taxpayer that any collection action be no more intrusive than necessary.[23] The Appeals officer properly based his determination on these factors.

Accordingly, respondent did not abuse his discretion when he rejected the Aredes' request for an installment agreement.

IV. Conclusion

Even when viewing the facts in the light most favorable to the Aredes, we find that respondent did not abuse his discretion in rejecting the Aredes' request for an installment agreement. Therefore, respondent's motion for summary judgment will be granted.

---

[23]Sec. 6330(c)(3).

**[\*15]** To reflect the foregoing,

<u>An appropriate order and decision will be entered</u>.