T.C. Memo. 2018-172

UNITED STATES TAX COURT

RICHARD H. LEVIN AND LINDA D. LEVIN, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11578-14L.                               Filed October 15, 2018.

Richard H. Levin and Linda D. Levin, pro sese.

<u>Steven M. Roth</u>, for respondent.

MEMORANDUM OPINION

ASHFORD, <u>Judge</u>:  Petitioners commenced this case pursuant to section

6330(d)(1)[1] in response to a determination by the Internal Revenue Service (IRS)

---

[1]Unless otherwise indicated, all section references are to the Internal
Revenue Code in effect at all relevant times, and all Rule references are to the Tax
Court Rules of Practice and Procedure.  Some monetary amounts are rounded to

(continued...)

**[*2]** Office of Appeals (Appeals) to uphold a levy on petitioners' property relating to their unpaid Federal income tax liability for the 2010 taxable year. The issue before the Court is whether to grant respondent's motion for summary judgment pursuant to Rule 121. Respondent contends that no genuine dispute exists as to any material fact and that Appeals' determination should be sustained as a matter of law. Petitioners responded to respondent's motion but failed to identify any material facts in dispute. Instead, petitioners object to the motion by taking issue with the documents upon which the motion relies (a sworn declaration and exhibits attached to the declaration, all of which were filed contemporaneously with the motion) on evidentiary grounds. As explained below, we will grant respondent's motion.

## Background

### I. Petitioners

Petitioners, Richard H. Levin and Linda D. Levin, husband and wife, resided in California at the time they filed their petition with the Court. Mr. Levin is an attorney who specializes in representing homeowners' associations and condominium owners in matters concerning construction defect claims against

---

[1](...continued)
the nearest dollar.

[*3] developers. Mr. Levin was a 60% partner in the law firm Levin & Stein, LLP, until 2009, when the partnership was terminated. The dissolution of the partnership left Mr. Levin with various financial obligations to his former partner and the firm's creditors.

In 2010 Mr. Levin founded the law firms Levin & Edin, LLP, and Condo Defects Law Group, LLP (LLPs), to continue his practice. He has 90% interests in both LLPs (with the remaining 10% interests being held by his daughter, Emily Levin). The LLPs have offices in multiple States.

Mrs. Levin is not employed outside of the home and has no independent source of income.

For 2010 petitioners' taxable income was $1,275,630.

At the time of Appeals' determination, Mr. Levin was 78 years old, Mrs. Levin was 67 years old, and they had no dependents.

II.  Petitioners' Underlying Liability for 2010

Petitioners' tax liability for 2010 is the result of their failure to make any estimated tax payments with respect to their significant taxable income.

On October 19, 2011, petitioners filed their joint Federal income tax return for 2010 on extension, reporting tax due of $468,696. They did not, however, remit payment for this liability when they filed their return. Accordingly, on

[*4] November 21, 2011, respondent assessed the liability plus certain additions to tax and interest, for a total assessment of $500,082.

On January 10, 2012, petitioners' authorized representative contacted the IRS to request a short-term installment agreement under which petitioners would pay their liability by May 9, 2012. The record does not indicate whether the IRS accepted this offer, but the IRS' certified transcripts for petitioners' 2010 taxable year indicate that petitioners made one payment of $50,000 during this four-month period.[2]

## III.    IRS' Collection Action

On September 3, 2012, the IRS sent petitioners in care of their authorized representative a Notice CP 90, Final Notice--Notice of Intent to Levy and Notice of Your Right to a Hearing (levy notice). The levy notice advised petitioners that the IRS intended to levy to collect their 2010 outstanding liability which, through the date of the levy notice, totaled $499,347, and that they had a right to a hearing to appeal the proposed collection action. The levy notice also advised petitioners

---

[2]The payment was credited to their 2010 account on May 9, 2012. Overpayments totaling $23,503 for the 2012 taxable year were applied to their 2010 account on January 7, April 5, and October 17, 2013, and petitioners made an additional payment of $50,000 with respect to their 2010 liability on February 18, 2014. As a result petitioners' balance due for 2010 was $376,579 as of September 17, 2014.

**[*5]** that the IRS might file a notice of Federal tax lien at any time to protect its interest.

In response to the levy notice, petitioners' authorized representative timely submitted on their behalf Form 12153, Request for Collection Due Process or Equivalent Hearing (CDP hearing request). The CDP hearing request did not challenge the underlying liability but did request the collection alternative of an installment agreement. As the reason for the CDP hearing request, the form stated:

> Taxpayer is a lawyer. Several large settlements have been held up. Accordingly, Taxpayer is not able to "full pay" immediately. Taxpayer requires an installment agreement. A Notice of Federal Tax Lien must not be filed as that will greatly impede his ability to earn. Taxpayer is selling his residence and will use the proceeds of sale to pay his taxes.

A representative from Appeals acknowledged receipt of the CDP hearing request by letter to petitioners' authorized representative dated November 20, 2012 (with a copy to petitioners), and the request was assigned to Settlement Officer Retta A. Dunnington (SO Dunnington). On December 13, 2012, SO Dunnington sent petitioners a letter (with a copy to their authorized representative) in which she scheduled a telephone CDP hearing on January 22, 2013. She also outlined the issues she had to consider during the hearing and informed them that

**[*6]** in order for her to consider a collection alternative they needed to submit to her by January 15, 2013, (1) "a completed Collection Information Statement (Form 433-A for individuals and/or Form 433-B for businesses)", together with supporting documentation and (2) proof that they had made estimated tax payments for 2012. She also indicated that they needed to have filed all Federal income tax returns required to be filed and since Mr. Levin had a business with employees, any required Federal tax deposits for the current tax quarter must have been timely paid in full. Finally, she informed them that if they preferred to reschedule the hearing or have a face-to-face conference, they should let her know by January 10, 2013; according to SO Dunnington, in order for petitioners to "meet the requirements" for a face-to-face conference, their request needed to be in writing; they needed to be in full compliance with all required Federal income tax returns, estimated tax payments, and Federal tax deposits; and they needed to provide to her a current financial statement with supporting documentation.

In response to SO Dunnington's December 13, 2012, letter, petitioners' authorized representative faxed her a letter dated January 12, 2013, requesting a face-to-face conference in Los Angeles, California, and enclosing copies of a completed Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, for petitioners, and completed Forms 433-B,

[*7] Collection Information Statement for Businesses, for the LLPs.[3] In section 4 of the Form 433-A petitioners indicated that they had cash on hand of $500, maintained three checking accounts that had total combined balances of $5,500, and had available credit totaling $26,186. Also in section 4 of that form, petitioners indicated that they owned (1) four homes (none of which was rental property) with a total combined equity of $1,510,306,[4] (2) a 1993 Lexus and a 1994 BMW with a total combined equity of $5,000,[5] (3) "domain names" valued at $1,000, and (4) "furniture and furnishings" valued at $35,000.

In section 5 of that form petitioners listed various monthly income and living expense items. With respect to the monthly income items, they indicated

---

[3]On January 14, 2013, Mr. Levin also faxed SO Dunnington these same forms.

[4]Petitioners' Form 433-A indicated that the four homes were: (1) a home in Pacific Grove, California, valued at $850,000 with respect to which there was a total outstanding mortgage balance of $1,002,253 and a total monthly mortgage payment of $6,652; (2) a home in Seattle, Washington, valued at $750,000 with respect to which there was a total outstanding mortgage balance of $553,387 and a total monthly mortgage payment of $3,371; (3) a home in Los Angeles, California, valued at $6 million with respect to which there was a total outstanding mortgage balance of $4,691,329 and a total monthly mortgage payment of $34,009; and (4) a home in St. Paul, Minnesota, valued at $300,000 with respect to which there was an outstanding mortgage balance of $294,978 and a monthly mortgage payment of $1,943.

[5]Each car was valued at $2,500 and had no outstanding loan balance.

[*8] that they had total monthly income of $79,333, consisting of Mr. Levin's distributions from the LLPs of $77,333 and Social Security income of $2,000. With respect to their monthly living expense items, petitioners indicated that they had total monthly living expenses of $88,550, consisting of food, clothing, housekeeping supplies, personal care products, and miscellaneous expenses[6] of $8,000; housing and utility expenses of $56,000; vehicle operating expenses of $500; health insurance expenses of $1,700; out-of-pocket health care expenses of $100; current year tax expenses of $2,000; life insurance premium expenses of $250; delinquent State or local tax expenses of $6,000; and other expenses of $14,000.[7]

On January 22, 2013, SO Dunnington called petitioners' authorized representative and explained to him that IRS records showed that petitioners were not in compliance with current estimated tax payment requirements for 2012 and that Mr. Levin had failed to file certain employment tax returns and make certain

---

[6]So-called miscellaneous expenses are those living expenses that are not included in any other category of living expense items shown in section 5 of the form, such as credit card payments, bank fees and charges, reading material, and school supplies.

[7]It appears that petitioners made an arithmetic error in section 5 of their Form 433-A. They listed their total monthly income as $79,333 and their total monthly living expenses as $88,550. However, the net difference between the two is listed as $7,217 rather than $9,217.

[*9] Federal tax deposits for a business under the name of Richard Levin Law Group. As far as the employment tax returns, SO Dunnington informed petitioners' authorized representative that petitioners would need to file these returns or show that the business had closed. Petitioners' authorized representative stated that he would contact petitioners to see whether the 2012 estimated tax payments had been made and inquire about the employment tax returns.

That same day, SO Dunnington received a facsimile from petitioners' authorized representative, with copies of a canceled check and an estimated tax payment voucher for a $22,500 payment made by petitioners for the fourth quarter of 2012. In the facsimile he noted that Mr. Levin's taxable income for 2012 was "de minimus [sic]" and that the $22,500 payment covered Mr. Levin's 2012 obligation. He also noted that Mr. Levin expected his 2013 taxable income to be higher and that he would be in compliance with his quarterly estimated tax payments for 2013. Petitioners' authorized representative further noted that Richard Levin Law Group was a "d.b.a." used by the LLPs for short-term hires of litigation staff for the first quarter of 2012 but not thereafter; it would, however, "be kept active as it is useful. It will not file 'final returns', but should file 'zero

[*10] due' returns." Finally, petitioners' authorized representative again requested a face-to-face conference in Los Angeles, California.

Later that day, SO Dunnington sent petitioners a letter (with a copy to their authorized representative) advising them that the scheduled telephone CDP hearing was canceled and that she was transferring their case to Appeals in Los Angeles, California, where it would be assigned to an Appeals or settlement officer who would contact them to schedule a face-to-face conference.

Settlement Officer James Wong (SO Wong) from Appeals in Los Angeles, California, was assigned petitioners' CDP hearing request. On November 27, 2013, SO Wong sent petitioners a letter (with a copy to their authorized representative) in which he scheduled a face-to-face CDP hearing on February 18, 2014. As SO Dunnington had done in her December 13, 2012, letter, SO Wong also outlined the issues he had to consider during the hearing. He requested (1) a copy of petitioners' joint Federal income tax return for 2012 and (2) an updated Form 433-A if their financial condition had changed since January 14, 2013. He also further noted that he would need verification of the loan balance amounts of their mortgages. Finally, he informed them that if they preferred to reschedule the hearing or another type of conference, they should call or write him within 14 days.

[*11] In response to SO Wong's November 27, 2013, letter, petitioners' authorized representative faxed SO Wong a letter dated February 11, 2014, enclosing an updated Form 433-A for petitioners and updated Forms 433-B for the LLPs, along with supporting documentation. In section 3 of the updated Form 433-A, petitioners now indicated that they had transferred certain assets valued at $80,594 on various dates from 2008 to 2011 to their daughter. In section 4 of this form petitioners indicated that they now (1) had no cash on hand, (2) maintained a savings account that had a balance of $53,082 (in addition to the three previously listed checking accounts that had total combined balances of $5,500), and (3) had available credit totaling $140,200 (whereas they had indicated on the 2013 Form 433-A that they had available credit totaling $26,186). Also in section 4 of this form, petitioners now listed Mr. Levin's interest in the LLPs valued at "unknown" and listed "domain names" and "household furnishings" valued at "unknown" (whereas they had indicated on the 2013 Form 433-A "domain names" valued at $1,000 and "furniture and furnishings" valued at $35,000). Finally, in section 4 of this form, petitioners indicated that they still owned four homes (none of which was rental property), but that they had sold their Los Angeles, California, home and in May 2013 purchased a home in Monterey, California, valued at $600,000

[*12] with respect to which there was a total outstanding mortgage balance of $450,000 and a total monthly mortgage payment of $3,558.[8]

In section 5 of the updated Form 433-A petitioners indicated that they had total monthly income of $43,300 (whereas they had previously indicated total monthly income of $79,333), consisting of Mr. Levin's distributions from the LLPs of $41,000 and Social Security income of $2,300. With respect to their monthly living expense items, they indicated on the form that they now had total monthly living expenses of $41,673 (whereas they had previously indicated total monthly living expenses of $88,550), consisting of food, clothing, housekeeping supplies, personal care products, and miscellaneous expenses of $900; housing

---

[8]Regarding their other three homes, petitioners indicated on the updated Form 433-A that their Pacific Grove, California, home was valued at $803,000 with respect to which there was a total outstanding mortgage balance of $980,870 and a total monthly mortgage payment of $6,652 (whereas they had previously indicated the value as $850,000 with a total outstanding mortgage balance of $1,002,253); their Seattle, Washington, home was valued at $868,000 with respect to which there was a total outstanding mortgage balance of $541,465 and a total monthly mortgage payment of $3,371 (whereas they had previously indicated the value as $750,000 with a total outstanding mortgage balance of $553,387); and their St. Paul, Minnesota, home was valued at $300,000 with an outstanding mortgage balance of $289,704 with respect to which there was a monthly mortgage payment of $1,943 (whereas they had previously indicated an outstanding mortgage balance of $294,978). Regarding the sale of their Los Angeles, California, home, petitioners included a copy of their final settlement statement, which indicated that they sold the home in March 2013 and collected $843,293 in net proceeds from the sale.

[*13] and utility expenses of $20,000; vehicle operating expenses of $500; health insurance expenses of $2,500; out-of-pocket health care expenses of $120; current year tax expenses of $2,000; life insurance premium expenses of $1,853; delinquent State or local tax expenses of $8,400; and other expenses of $5,400.

In the February 11, 2014, letter, petitioners' authorized representative provided background information regarding Mr. Levin and the dissolution of his law partnership in 2009. He also discussed petitioners' financial problems and indicated that they used the net proceeds from the sale of their Los Angeles, California, home to pay then-existing debt other than their 2010 outstanding Federal income tax liability (i.e., State tax debt, and credit card debt in excess of $150,000) and to "infuse start-up capital" for Mr. Levin's new law practice. He proposed as a collection alternative an installment agreement in which petitioners would make an initial payment of $50,000, another payment 60 days thereafter of $50,000, and then monthly payments of $8,400 for 60 months.[9] He further proposed that petitioners would make additional payments periodically upon the liquidation of an asset; they would continue their efforts to sell their remaining nonresidential, non-business-related real property; and they would use the

---

[9]The $8,400 reflected in section 5 of petitioners' updated Form 433-A represents the monthly payments petitioners proposed to make for 60 months.

[*14] proceeds of any such sale to pay their 2010 outstanding Federal income tax liability.

On February 13, 2014, SO Wong called petitioners' authorized representative and informed him that he would be willing to accept petitioners' proposed installment agreement but that a notice of Federal tax lien would need to be filed concurrent with the execution of the installment agreement because of petitioners' significant outstanding balance for 2010. In response petitioners' authorized representative stated that he would discuss the lien filing issue with petitioners and get back to him in a few days.

On February 18, 2014, petitioners' authorized representative called SO Wong, requesting that the face-to-face CDP hearing be rescheduled so that he could further discuss the lien filing issue with petitioners. SO Wong agreed to reschedule the hearing for March 11, 2014. Petitioners' authorized representative also sent SO Wong a letter dated February 18, 2014, enclosing a check from petitioners for the initial proposed payment of $50,000.[10]

Petitioners' authorized representative faxed SO Wong a letter dated March 10, 2014, stating that petitioners expected to have a Federal income tax liability

---

[10]This payment was credited to petitioners' 2010 account on February 18, 2014. See supra note 2.

[*15] for the 2013 taxable year which, like the outstanding 2010 Federal income tax liability, they could not pay immediately, and that therefore he requested to amend the proposed installment agreement to a 72-month term with monthly payments of $8,400 for a year, followed by "a significant increase" in the monthly payment for the remaining 60 months. Petitioners' authorized representative also requested that the IRS not file a notice of Federal tax lien because such a filing would prevent Mr. Levin "from expanding his legal practice into new venues[] and * * * [would] prevent him from securing essential business lines of credits [sic]." According to petitioners' authorized representative:

> Several states where * * * [Mr. Levin] hopes to expand his practice will likely not grant him a law license if [the] IRS files a tax lien. Also, * * * [the] LLPs must secure lines of credit to expand. The credit worthiness [sic] or not of * * * [Mr. Levin] is a crucial factor in getting credit.

> \*        \*        \*        \*        \*        \*        \*

> [Mr. Levin] regrets that his new practice has not developed farther than it is at present. Unfortunately, start-up costs have been greater than anticipated. The new LLPs rely on * * * [Mr. Levin's] credit, as they are unable to obtained [sic] business lines of credit at this time. Accordingly, * * * [Mr. Levin's] good credit rating is an essential element of his new legal practice. The filing of a NFTL will destroy his credit rating, which, in turn, will adversely impact the new LLPs' chances of success.

> \*        \*        \*        \*        \*        \*        \*

[*16] It is only through * * * [Mr. Levin's] earnings that [the] IRS will ultimately be paid. The IRS should not eliminate the opportunity to receive full payment by filing the NFTL.

The face-to-face CDP hearing took place as rescheduled. During the hearing SO Wong questioned petitioners' authorized representative about the amount and use of the net proceeds from the 2013 sale of petitioners' Los Angeles, California, home. He also noted that petitioners had already had two years to resolve their outstanding 2010 Federal income tax liability without the IRS' filing a notice of Federal tax lien and that they could have done so, at least in part, with those sale proceeds. SO Wong further stated that he could not accept an installment agreement without knowing petitioners' liability for the 2013 taxable year. In response petitioners' authorized representative reiterated that if the IRS filed a notice of Federal tax lien it would harm Mr. Levin's ability to secure business lines of credit and thus expand his legal practice into additional States. He stated that petitioners used the 2013 sales proceeds to "pay off" Mr. Levin's former law partner, pay "back pay" to one of his employees, and capitalize the LLPs. He requested that petitioners be allowed the opportunity to file their 2013 Federal income tax return. SO Wong granted petitioners' authorized representative until March 28, 2014, to provide to him petitioners' 2013 Federal

[*17] income tax return and any additional documents in support of their CDP hearing request.

On March 26 and 27, 2014, petitioners' authorized representative faxed letters to SO Wong. In the March 26, 2014, letter, he stated in pertinent part that petitioners would not be able to provide their 2013 Federal income tax return before mid-May 2014 because the records needed to prepare that return were in storage and business requirements had forced Mr. Levin out of State until mid-April. In the March 27, 2014, letter, he confirmed that petitioners received net proceeds of $843,293 for the sale of their Los Angeles, California, home in 2013. He also set forth, as follows, how most of the net proceeds were distributed:

| | |
|---|---:|
| Taxes to California Franchise Tax Board - via wire transfer | $189,907 |
| Taxes to Oregon - via wire transfer | 13,078 |
| Taxes to Minnesota - via wire transfer | 12,734 |
| Taxes to Minnesota - via wire transfer | 2,800 |
| Taxes to Minnesota - via wire transfer | 2,000 |
| California Franchise Tax Board | 70,999 |
| Payment to Frank Elsasser - former employee | 50,000 |
| Wells Fargo credit card debt | 18,000 |
| American Express credit card debt | 26,150 |
| Bank of America credit card debt | 18,920 |

[*18]

| | |
|---|---|
| Bank of America credit card debt | 5,000 |
| Wells Fargo credit card debt | 26,879 |
| Wells Fargo credit card debt | 10,000 |
| Wells Fargo credit card debt | 13,535 |
| Bank of America credit card debt | 32,372 |
| Capital contribution - Levin & Edin | 281,000 |
| Contribution - Condo Defects Law Group | 28,000 |

Regarding why petitioners used the net proceeds in the aforementioned manner, he

stated in the March 27, 2014, letter:

> Taxpayers['] original intent was to satisfy their 2010 income tax
> obligations from the proceeds of either the refinancing or sale of their
> residential property.  The property was listed for sale, but after more
> than three years on the market, they received only one offer, for $6.3
> million, which was almost $2 million less than the original asking
> price.  Taxpayers did not receive enough pay to pay both [the] IRS
> (either the 2010 income tax obligation or the 2012 capital gain tax)
> and other deferred obligations.  Taxpayers opted to use the available
> funds to pay other creditors to avoid imminent (and potentially
> ruinous) litigation.  Any excess funds were used to re-establish * * *
> [Mr. Levin's] legal practice, the income from which will allow [the]
> IRS to be paid in full.

Except for again providing a copy of petitioners' final settlement agreement with

respect to the 2013 sale of their Los Angeles, California, home, petitioners'

authorized representative did not provide to SO Wong any additional financial

information or documents.

**[*19]** SO Wong determined that the proposed levy should be sustained, and on

April 23, 2014, Appeals sent a notice of determination to each petitioner (with a

copy to petitioners' authorized representative) to that effect.  A summary detailing

the matters considered by Appeals was attached to each notice of determination

and included the following explanations:

> **Discussion and analysis:**
>
> I verified through transcript analysis that [the] tax assessment was
> properly made per IRC § 6201. * * *
>
> *       *       *       *       *       *       *
>
> **Issue Raised by the Taxpayers**
>
> The underlying liability was not raised.
>
> *       *       *       *       *       *       *
>
> The taxpayers' reported monthly income of $43,300 and monthly
> living expense of $41,673 was use [sic] to evaluate their ability to
> pay.
>
> **The analysis of the Form 433-A Collection Information Statement
> for Individuals (CIS):**

| Item | Actual Amount Claimed | Deviation Allowable? | Maximum Allowable Amount | Amount Allowed for Computation |
|---|---|---|---|---|
| Gross Monthly Income | $43,300 | | | $43,300 |

**[*20]**

| | | | | |
|---|---|---|---|---|
| Food, Clothing and Misc. | 900 | | 1,092 | -1,092 |
| Housing and Utilities | 20,000 | | 2,633 | -2,633 |
| Ownership Costs - Car 1 | | | 517 | -0 |
| Operating costs - Car 2 | | | 517 | -0 |
| Operating Costs - Both Cars | 500 | X | 472 | -500 |
| Public Transportation Costs | | | 184 | -0 |
| Health Insurance | 2,500 | | 2,500 | -2,500 |
| Out-of-pocket Health Care | 120 | | 288 | -288 |
| Court Ordered Payments | | | | -0 |
| Child/Dependent Care | | | | -0 |
| Life Insurance | 1,853 | | 400 | -400 |
| Current Year Taxes | 2,000 | | 2,000 | -2,000 |
| Secured Debts | | | | -0 |
| Delinquent State or Local Taxes | 8,400 | | 0 | -0 |
| Other Expenses | 5,400 | | 0 | -0 |

Gross Monthly Income: $43,300

Total Allowable Expenses Computation:  -9,413

**Minimum Monthly Payment Amount: $33,887**

\*        \*        \*        \*        \*        \*        \*

**[*21] Conclusion:**

The proposed levy action is sustained. The proposed $8,400 with an increase after 12 months without the NFTL cannot be accepted. Because the taxpayers are not in incompliance [sic] with their estimated tax payments for tax year 2013, they do not qualify for an IA [installment agreement] at this time. As stated above, the 2013 actual tax liability is unknown; therefore the consideration to include tax year 2013 cannot be made.

If their IA <u>can</u> be consider [sic] at this time, their request for an IA without the filing of the NFTL would not be prudent and consistent with the policy set for [sic] in the IRM. The filing of the NFTL will not prevent the taxpayers from paying their tax liability. The CIS [Collection Information Statement] shows that taxpayers do have sufficient income to pay the tax liability in an IA. The none filing [sic] of the NFTL allowed the taxpayers to transfer assets to pay other creditor [sic], purchase additional property and transfer the balance of the money into the LLPs. As require [sic] by IRC 6330, Appeals is require [sic] to balance the taxpayers' legitimate concerns with Compliance's need for efficient collection of tax.

The taxpayers were given a reasonable amount of time to get financing to expand Mr. taxpayer's law practice, to reduce or to pay the tax liability without having an NFTL filed, instead of reducing the tax liability; [sic] the taxpayers will owe additional tax liability on tax year 2013. In addition, Mr. taxpayer already had an opportunity to expand his LLPs by transferring $281,000 to Levin & Edin, [sic] $28,000 to Condo Defects. The LLPs have law offices in at least three states.

The evidence shows Mr. taxpayer would rather continue to expand his LLPs, [sic] purchase additional property than to deal with the tax liability at hand. Because the IA cannot be consider [sic] at this time, the proposed levy action is sustained.

**[*22]** On May 21, 2014, petitioners timely filed a petition with this Court for review of each notice of determination.

### Discussion

I.    Summary Judgment

The purpose of summary judgment is to expedite litigation and avoid unnecessary and expensive trials. Fla. Peach Corp. v. Commissioner, 90 T.C. 678, 681 (1988). Summary judgment may be granted where the moving party shows, through "the pleadings * * * and any other acceptable materials, together with the affidavits or declarations, if any, * * * that there is no genuine dispute as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994). The burden is on the moving party to demonstrate that there is no genuine dispute as to any material fact; consequently, factual inferences will be viewed in a light most favorable to the party opposing summary judgment. Dahlstrom v. Commissioner, 85 T.C. 812, 821 (1985); Jacklin v. Commissioner, 79 T.C. 340, 344 (1982). The nonmoving party may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine dispute for trial. Rule 121(d); Sundstrand Corp. v. Commissioner, 98 T.C. at 520. On the basis of the record, we conclude that there

**[\*23]** is no genuine dispute as to any material fact and that a decision may be rendered as a matter of law.

II.  Standard of Review

Where the taxpayer's underlying liability is properly at issue, the Court reviews any determination regarding the underlying liability de novo.  Goza v. Commissioner, 114 T.C. 176, 181-182 (2000).  Where the taxpayer's liability is not properly at issue, we review Appeals' determination for abuse of discretion only.  Hoyle v. Commissioner, 131 T.C. 197, 200 (2008); Goza v. Commissioner, 114 T.C. at 182.  A determination is an abuse of discretion if it is arbitrary, capricious, or without sound basis in fact or law.  Murphy v. Commissioner, 125 T.C. 301, 308, 320 (2005), aff'd, 469 F.3d 27 (1st Cir. 2006).

Petitioners do not challenge their underlying Federal income tax liability for 2010.  Thus, because their underlying liability is not properly before the Court, we will review Appeals' determination for abuse of discretion only.[11]

---

[11]Even if petitioners did challenge their underlying liability here, we would not entertain such a challenge because they did not raise the issue of their underlying liability before Appeals.  See Giamelli v. Commissioner, 129 T.C. 107, 114-115 (2007).

**[*24]** III.    <u>Analysis</u>

    A.    <u>CDP Review Procedure for a Proposed Levy</u>

Under section 6331(a), if any person liable to pay any tax neglects or refuses to do so after notice and demand, the Commissioner is authorized to collect the unpaid amount by way of a levy upon all property and rights to property belonging to such person or upon which there is a lien. Pursuant to section 6330(a), the Commissioner must provide the person with written notice of an opportunity for an administrative hearing to review the proposed levy.

If an administrative hearing is requested in a levy case, the hearing is to be conducted by Appeals. Sec. 6330(b)(1). At the hearing the Appeals officer conducting it must obtain verification that the requirements of applicable law and administrative procedure have been met. Sec. 6330(c)(1). The taxpayer may raise at the hearing any relevant issue relating to the unpaid tax or the proposed levy, including, as relevant here, offers of collection alternatives, such as an installment agreement.[12] Sec. 6330(c)(2)(A). Following the hearing the Appeals officer must determine among other things whether the proposed collection action is appropriate. In reaching the determination the Appeals officer must take into

---

[12]Additionally, under certain circumstances not relevant here, the taxpayer may raise at the hearing challenges to the underlying tax liability. Sec. 6330(c)(2)(B).

[*25] consideration: (1) whether the requirements of applicable law and administrative procedure have been met; (2) all relevant issues raised by the taxpayer, including offers of collection alternatives, such as an installment agreement; and (3) whether any proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of the taxpayer that collection be no more intrusive than necessary. Sec. 6330(c)(3); see also Lunsford v. Commissioner, 117 T.C. 183, 184 (2001).

Petitioners do not dispute, and the record shows, that SO Wong verified that the applicable legal and administrative procedural requirements were met. Petitioners also do not allege that SO Wong failed to balance the need for efficient tax administration with the intrusiveness of collection for them. Petitioners directly address Appeals' determination to sustain the proposed levy in their petition only; in their responses to respondent's motion for summary judgment,[13] petitioners object to the motion merely on evidentiary grounds.[14] We look at their

---

[13]Pursuant to orders of this Court, petitioners timely filed an objection to respondent's motion for summary judgment on April 14, 2015, and a supplemental objection on July 15, 2015.

[14]In their April 14, 2015, filing, petitioners also contend that respondent's motion is untimely under Rule 121(a) "because it was filed so late that it will now unavoidably delay the trial in this case." Under Rule 121(a), a party moving for summary judgment may make such a motion "at any time commencing 30 days

(continued...)

[*26] evidentiary objections first and then will turn to the propriety of Appeals'

determination.

### B.     Evidentiary Objections

Petitioners take issue with both SO Wong's declaration and the documents

attached thereto.  Specifically, petitioners contend that the declaration is deficient

because (1) SO Wong failed to assert that he has the personal knowledge,

capacity, and credibility to testify to the facts recited in his declaration and (2) it

contains inadmissible hearsay.[15]  Petitioners contend that the documents are

inadmissible because they have not been authenticated and respondent has not

---

[14](...continued)
after the pleadings are closed but within such time as not to delay the trial, and in any event no later than 60 days before the first day of the Court's session at which the case is calendared for trial, unless otherwise permitted by the Court."  Respondent filed his motion for summary judgment well within this period; the motion was filed on January 12, 2015, over five months after he filed his answer and over five months before the first day of the Court's session at which this case was calendared.  Accordingly, petitioners' contention as to the timeliness of respondent's motion has no merit.

[15]Petitioners also contend that respondent has not submitted a separate statement of proposed undisputed facts "as appears to be required under Rule 56-1, U.S. District Court, Central District of California, Local Rules of Practice."  The Tax Court Rules of Practice and Procedure and not the local rules of the U.S. District Court for Central District of California govern the practice and procedure in all cases and proceedings before this Court.  Rule 1(b).  Pursuant to Rule 121(b), respondent has set forth in the background section of his motion the material facts as to which he contends there is no genuine dispute.

[*27] otherwise established a foundation for their admission. Petitioners, however, misapprehend the nature and purpose of SO Wong's declaration and the documents attached thereto and the burden that is imposed on the parties in supporting or opposing a motion for summary judgment.

Under Rule 121(d), a party moving for or opposing summary judgment may support his position with affidavits or declarations that "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant or declarant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit or a declaration shall be attached thereto or filed therewith."

In accordance with that rule respondent filed in support of his motion for summary judgment a declaration of SO Wong, together with "true and correct copies" of all of the documents SO Wong referred to in the declaration. In the declaration SO Wong states that petitioners' CDP hearing request was assigned to him. He identifies, and in many instances describes, the documents attached to the declaration as either documents he (or another IRS employee) created during the CDP proceedings below or documents petitioners' authorized representative submitted to the IRS (including to SO Wong) during the CDP proceedings below.

**[*28]** He states that these were the documents he considered in making the determination to sustain the proposed levy. Consequently, it is unmistakable that the declaration was made on personal knowledge and shows affirmatively that SO Wong is competent to testify to the matters stated therein.

It is also apparent that the declaration merely attempts to set forth a narrative timeline of the CDP proceedings below, restating what is contained in the documents. It is not, as petitioners claim, inadmissible hearsay; it is a proper declaration to support a motion for summary judgment under Rule 121(d). Cf. Fed. R Evid. 801(c) (hearsay is a statement (1) other than one made by the declarant while testifying at the trial or hearing and (2) that a party offers in evidence to prove the truth of the matter asserted in the statement); Fed. R. Evid. 802 (hearsay is not admissible except as otherwise provided by a Federal statute, the Federal Rules of Evidence, or other rules prescribed by the U.S. Supreme Court).

Regarding the documents attached to SO Wong's declaration, these are all documents that are a part of the administrative record. Respondent has submitted the administrative record with his motion for summary judgment not to prove the truth of the contents of those documents but rather to show what documents SO Wong relied on to make the determination to sustain the proposed levy. The

[*29] documents therefore are not hearsay and would be admissible at trial or hearing for that purpose if authenticated. See Fed. R. Evid. 105 (use of evidence admitted for limited purpose must be restricted to that purpose).

Under rule 901(a) of the Federal Rules of Evidence, "evidence sufficient to support a finding that the item is what the proponent claims" will authenticate an item of evidence. A witness with knowledge who testifies that the item is what it is claimed to be will satisfy this authentication requirement. Id. subdiv. (b)(1). SO Wong's statements in his declaration are more than sufficient to authenticate the documents attached thereto as part of the administrative record. Indeed, petitioners' objection with respect to the documents resembles one that taxpayers have previously proffered to, and which has been rejected by, this Court. See Meyer v. Commissioner, T.C. Memo. 2013-268, at *20 ("[I]tems in an administrative record need not be independently admissible. * * * If they needed to be independently admissible, then the Appeals officer would abuse his discretion if he relied on any document that would not be admissible in a deficiency case. This would effectively merge deficiency law and CDP law, a result we reject.").

Petitioners' objection to the granting of respondent's motion for summary judgment boils down to little more than a demand to cross-examine SO Wong at

[*30] trial to challenge his credibility as to the facts revealed by the documents that are part of the administrative record. But petitioners must first demonstrate that they are entitled to a trial at all by showing specific facts on which respondent relies that they dispute. Rule 121(d); see Doff v. Brunswick Corp., 372 F.2d 801, 805 (9th Cir. 1966) ("It is * * * [the opposing party's] duty to expose the existence of a genuine issue which will prevent the trial from being a useless formality."); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (an opposing party "must do more than simply show there is some metaphysical doubt as to the material facts."). Petitioners have not done so, failing to indicate a single specific fact anywhere in the administrative record that they dispute. Further, petitioners have not even suggested any factual basis on which they would challenge SO Wong's credibility or the administrative record itself or otherwise show an abuse of discretion.

Petitioners state that "they * * * [would] not object to the introduction of most of the proposed exhibits, at trial, [but] * * * that for purposes of the pending motion, they do object [to the exhibits] on the grounds of authentication and lack of foundation." Because the standard we follow is whether such facts set forth in a declaration supporting summary judgment in the moving party's favor "would be admissible" at trial, we find that this is a baseless distinction and effectively a

[*31] concession by petitioners that they do not actually dispute the authenticity of the documents (i.e., the administrative record) or the facts revealed therein. See Rule 121(d). We do not consider it a worthwhile use of the Court's time to hold a full trial solely to wrangle further over the theoretical application of evidentiary rules to otherwise undisputed facts.

Accordingly, we reject petitioners' evidentiary objections.

C.      Rejection of the Installment Agreement

Section 6159(a) authorizes the Commissioner to enter into written agreements allowing taxpayers to pay tax in installments if he deems that the "agreement will facilitate full or partial collection of such liability." See also Thompson v. Commissioner, 140 T.C. 173, 179 (2013). The decision to accept or reject installment agreements lies within the discretion of the Commissioner. Id.; see also sec. 301.6159-1(a), (c)(1)(i), Proced. & Admin. Regs. We do not make an independent determination of what would be an acceptable alternative. Murphy v. Commissioner, 125 T.C. at 320. If the Appeals officer follows all statutory and administrative guidelines and provides a reasoned, balanced decision, we will not reweigh the equities. Thompson v. Commissioner, 140 T.C. at 179.

In their petition, petitioners disagree with the determination to sustain the proposed levy because they contend that SO Wong (1) did not properly analyze

**[\*32]** their ability to pay as reflected in the financial information they submitted to him and (2) improperly concluded that a notice of Federal tax lien would need to be filed concurrently with the execution of any installment agreement with them.[16]

    1.    Ability To Pay

This Court has generally held that there is no abuse of discretion when an Appeals officer relies on guidelines published in the Internal Revenue Manual (IRM) to evaluate a proposed installment agreement. See, e.g., Orum v. Commissioner, 123 T.C. 1, 13 (2004), aff'd, 412 F.3d 819 (7th Cir. 2005); Tillery v. Commissioner, T.C. Memo. 2015-170; Arede v. Commissioner, T.C. Memo. 2014-29; Maselli v. Commissioner, T.C. Memo. 2010-19; Aldridge v. Commissioner, T.C. Memo. 2009-276; Etkin v. Commissioner, T.C. Memo. 2005-245. When a collection alternative is at issue, IRM pt. 8.22.4.2.1(4) (Nov. 5,

---

[16]SO Wong actually rejected petitioners' proposed installment agreement in the first instance because they were not current in making adequate estimated tax payments for 2013. However, petitioners seemingly do not challenge this reason by assigning error to it in their petition; thus, we deem petitioners to have conceded this issue. See Rule 331(b)(4); Swain v. Commissioner, 118 T.C. 358 (2002). In any event, suffice it to say, it is not an abuse of discretion for a settlement officer to refuse a taxpayer's proposed installment agreement where the taxpayer is not current with tax filing and estimated tax payment requirements. See Giamelli v. Commissioner, 129 T.C. at 111-112; Boulware v. Commissioner, T.C. Memo. 2014-80, aff'd, 816 F.3d 133 (D.C. Cir. 2016); Friedman v. Commissioner, T.C. Memo. 2013-44; Starkman v. Commissioner, T.C. Memo. 2012-236.

**[*33]** 2013) directs an Appeals officer to the appropriate IRM sections containing the administrative policies and procedures relating to that alternative; as relevant here, IRM pt. 5.14.1.4 (June 1, 2010) governs installment agreement acceptance and rejection determinations, and IRM pt. 5.15.1 (Oct. 2, 2010) (Financial Analysis Handbook) provides instructions for securing, verifying, and analyzing financial information of a taxpayer for purposes of determining the taxpayer's ability to pay outstanding tax liabilities.

IRM pt. 5.14.1.4 prescribes that an installment agreement must reflect taxpayers' ability to pay on a monthly basis throughout the duration of the agreement and that the primary source of information an Appeals officer is to consider in accepting or rejecting a proposed agreement is the financial information provided by a taxpayer on a collection information statement (i.e., a Form 433-A or Form 433-B), along with supporting documentation. The Financial Analysis Handbook directs an Appeals officer to "[a]nalyze the income and expenses [reflected on Form 433-A or 433-B] to determine the amount of disposable income (gross income less all allowable expenses) available to apply to the tax liability." IRM pt. 5.15.1.2 (Oct. 2, 2012). It also directs an Appeals officer to "[i]dentify liquid assets which can be pledged as security or readily converted to cash" and to "[c]onsider unencumbered assets, equity in encumbered

[*34] assets, interests in estates and trusts, and lines of credit from which money may be borrowed to make payment." Id. pt. 5.15.1.2(2)(c) and (d).

According to the Financial Analysis Handbook, allowable expenses "include those expenses that * * * are necessary to provide for a taxpayer's and his or her family's health and welfare and/or production of income" or otherwise allowable "based on the circumstances of an individual case". Id. pt. 5.15.1.7(1). Further, the Financial Analysis Handbook states:

> The determination of a reasonable amount for basic living expenses will be made by the Commissioner and will vary according to the unique circumstances of the individual taxpayer. Unique circumstances, however, do not include the maintenance of an affluent or luxurious standard of living.

Id. pt. 5.15.1.1(8) (citing section 301.6343-1(b)(4), Proced. & Admin. Regs.). Accordingly, an Appeals officer is advised to use the national and local expense standards as guidelines for allowable living expenses (and not simply rely on the living expenses reported on a taxpayer's Form 433-A) in evaluating the adequacy of a proposed installment agreement. Id. pt. 5.15.1.7(1) and (2); see also Perrin v. Commissioner, T.C. Memo. 2012-22, slip op. at 7-8 ("The use of local and national standards is expressly authorized by Congress and does not constitute an abuse of discretion even if it forces a taxpayer * * * to change his lifestyle."); Aldridge v. Commissioner, T.C. Memo. 2009-176, slip op. at 14 ("The taxpayer

[*35] has the burden of providing information * * * to justify a departure from the local standards." (citing Lindley v. Commissioner, T.C. Memo. 2006-229, aff'd sub nom. Keller v. Commissioner, 568 F.3d 710 (9th Cir. 2009))).

In evaluating petitioners' proposed installment agreement, SO Wong analyzed the information listed on their Form 433-A, along with the supporting documentation submitted with the form. Petitioners' largest reported monthly living expense was $20,000 for "Housing and Utilities". On the basis of the supporting information, SO Wong concluded that the bulk of this expense reflected monthly mortgage payments on petitioners' multiple homes, all of which were held for personal (and not rental) use, and he calculated that this expense exceeded the standard allowable amount by $17,367. SO Wong thus used the maximum monthly allowable amount of $2,633 for housing and utilities expenses. See IRM pt. 5.8.5.22.2 (Oct. 22, 2010); IRM pt. 5.15.1.9(1) (Oct. 2, 2012); Allowable Living Expense Housing and Utilities Standards - effective 03/31/2014, https://web.archive.org/web/20141023021308/http://www.irs.gov:80/pub/irs-utl/all_states_housing_standards.pdf (last visited Sept. 24, 2018). He also made adjustments on the basis of the national and local standards (some in petitioners' favor, some not in petitioners' favor) to other monthly living expenses they reported. Ultimately, SO Wong's computations resulted in his concluding that

[*36] petitioners' were able to pay $33,887 per month, significantly greater than the $8,400 they proposed. Petitioners' complaint is that SO Wong should have reached a different conclusion on the basis of the financial information submitted. SO Wong, however, properly followed the IRM; therefore, he committed no abuse of discretion in analyzing petitioners' ability to pay in the context of evaluating their proposed installment agreement. See O'Donnell v. Commissioner, T.C. Memo. 2013-247, at *15 ("In reviewing for abuse of discretion, we do not recalculate a taxpayer's ability to pay and substitute our judgment for that of the settlement officer.") (and cases cited thereat).[17]

2. Notice of Federal Tax Lien Filing

Under section 6321, if any person liable to pay any tax neglects or refuses to do so after notice and demand, the amount, including any interest, addition to tax, or assessable penalty, shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person. The lien is perfected when the assessment is made after notice and demand. Szekely v. Commissioner, T.C. Memo. 2013-227, at *7 (and cases cited thereat). However, the filing of a notice of Federal tax lien in the appropriate place ensures priority of

_____

[17]We observe, however, that petitioners may have had an even greater ability to pay than what SO Wong concluded because their Form 433-A reflects that they had significant equity in their real property.

[*37] the Federal tax lien over positions of most competing creditors. See sec. 6323. IRM pt. 5.14.1.4.2(1) (Mar. 4, 2011) states: "Prior to granting installment agreements, ensure the government's interest is protected. This includes filing and refiling Notices of Federal Tax Lien (NFTL), if necessary." Further, according to IRM pt. 5.12.2.6(1) (Oct. 14, 2013), "[i]n general" a notice of Federal tax lien "should be filed" under certain specified circumstances, including where, as relevant here, the total balance of all unpaid and assessed tax periods for the taxpayer is $10,000 or more or if an installment agreement does not meet streamlined or guaranteed criteria.[18]

In Budish v. Commissioner, T.C. Memo. 2014-239, we addressed the propriety of an Appeals officer's insistence on the filing of a notice of Federal tax lien as a condition of entering into an installment agreement with a taxpayer. We observed that the aforementioned terms "in general" and "should be filed" indicate that there may be occasions in which it is not necessary to file a notice of Federal tax lien. We thus held that the Appeals officer erroneously concluded that the IRM mandated the filing of a notice of Federal tax lien in the circumstances of the

_____

[18]Petitioners do not contend that their proposed installment agreement meets the streamlined or guaranteed criteria (and on the basis of their total balance for 2010 as of the date of issuance of each notice of determination, their agreement does not meet these criteria in any event). See IRM pt. 5.14.5.2 and .3 (Sept. 26, 2008).

[*38] case.  We further held that as a result, the Appeals officer failed to appropriately balance the need for the efficient collection of taxes with the legitimate concern of the taxpayer that the collection action (i.e., the notice of Federal tax lien) be no more intrusive than necessary as required by section 6330(c)(3)(C).  We accordingly remanded the case to Appeals to conduct a supplemental CDP hearing to perform the required balancing.

While the Memorandum Opinion in Budish stands for the proposition that the IRM does not mandate the filing of a notice of Federal tax lien in all circumstances, we find it difficult to question SO Wong's conclusion under the circumstances in this case that a notice of Federal tax lien would need to be filed concurrently with the execution of any installment agreement with petitioners.  The administrative record shows that petitioners have repeatedly chosen to not prioritize payment of their 2010 outstanding Federal income tax liability.  Indeed, their failure to use the net proceeds of $843,293 from the 2013 sale of their Los Angeles, California, home to pay their 2010 liability was particularly brazen.  And petitioners' failure to adhere to earlier promises of payment of their 2010 liability both before and during the CDP proceedings below and their failure to attempt to liquidate or borrow against their other assets or equity merely confirms the reasonableness of SO Wong's conclusion that a notice of Federal tax lien would

[*39] need to be filed in conjunction with the execution of petitioners' proposed installment agreement.

In their petition, petitioners reiterate the contention they made to SO Wong that the filing of a notice of Federal tax lien will prevent Mr. Levin from earning income sufficient to pay their Federal income tax liabilities. In Budish the taxpayer made a similar argument. However, in Budish the taxpayer presented examples of terms in critical business contracts and representations from business partners demonstrating that a notice of Federal tax lien would have specific devastating consequences for his business operations, concerns that the Appeals officer failed to properly consider or address. In contrast, petitioners did not present any concrete evidence to SO Wong to substantiate their contention, only unsupported assertions that financial institutions might not be as willing to provide Mr. Levin with business lines of credit if a notice of Federal tax lien was filed. See Bergdale v. Commissioner, T.C. Memo. 2014-152, at *17-*18 (taxpayer "neither averred credible evidence beyond his bare allegations nor advanced any detailed argument" that "the NFTL has damaged his personal credit report, resulted in the closure of his bank accounts and credit card accounts, resulted in a loss of his business' relationships with clients, * * * caused foreclosure proceedings on his coop apartment * * * [, and] hindered his ability to generate

[*40] financing to satisfy his employment tax liabilities"); <u>Berkery v. Commissioner</u>, T.C. Memo. 2011-57, slip op. at 12 ("[T]here is no evidence in the record to suggest that the NFTL is impairing petitioner's ability to pay his outstanding tax liabilities."); <u>see also</u> <u>Hughes v. Commissioner</u>, T.C. Memo. 2011-294, slip op. at 7 ("Every NFTL filed by the Commissioner damages the taxpayer's credit. By itself, that fact does not show that the NFTL impairs the taxpayer's ability to satisfy the tax liability."). On the basis of the administrative record, it is apparent that SO Wong duly considered petitioners' contentions, ultimately concluding that the filing of a notice of Federal tax lien would not have any significant effect on petitioners' ability to secure financing and/or was necessary to ensure the Government's interest is protected. Consequently, we cannot say that SO Wong committed an abuse of discretion in this regard.

In the light of the above, the Court finds that SO Wong did not abuse his discretion in rejecting petitioners' proposed installment agreement and sustaining the proposed levy for 2010. The administrative record shows that he: (1) verified that all legal and procedural requirements were met, (2) considered all issues petitioners raised, and (3) determined that the proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of petitioners that the collection action be no more intrusive than necessary.

**[*41]** IV.   Conclusion

Petitioners have not given a sufficient basis to deny summary adjudication in respondent's favor pursuant to Rule 121.  Respondent having shown that there is no genuine dispute of material fact and that he is entitled to judgment as a matter of law, we will grant his motion for summary judgment.  Petitioners are of course free to continue to negotiate with the IRS concerning their 2010 outstanding Federal income tax liability, but they are entitled to only one CDP hearing and Tax Court proceeding with respect to the proposed levy.  See Perrin v. Commissioner, T.C. Memo. 2012-22, slip op. at 8.

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or meritless.

To reflect the foregoing,

An appropriate order and decision will be entered for respondent.