T.C. Memo. 2019-165

UNITED STATES TAX COURT

WENDIE MARGOLIS-SELLERS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13948-16L.                    Filed December 18, 2019.

<u>Steven R. Mather</u> and <u>Lydia B. Turanchik</u>, for petitioner.

<u>Halvor R. Melom</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

ASHFORD, <u>Judge</u>:  Petitioner commenced this collection due process

(CDP) case pursuant to section 6330(d)(1)[1] in response to a determination by the

_____

[1]Unless otherwise indicated, all section references are to the Internal
Revenue Code in effect at all relevant times, and all Rule references are to the Tax
Court Rules of Practice and Procedure.  Some monetary amounts are rounded to

(continued...)

[*2] Internal Revenue Service (IRS) Office of Appeals[2] (Appeals) to uphold a proposed levy on petitioner's property relating to her unpaid Federal income tax liabilities for the 2009 and 2012 taxable years (years at issue).  The issue for decision is whether Appeals abused its discretion in sustaining the proposed collection action.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  The stipulation of facts and the attached exhibits are incorporated herein by this reference.  Petitioner resided in California when the petition was filed with the Court.

I.    Petitioner and Her Underlying Liabilities for the Years at Issue

Petitioner is self-employed as an independent producer of movie and television projects.  At the time of Appeals' determination, she was divorced with one dependent child (a 16-year-old daughter).  Her ex-husband, Dylan Sellers, is also a movie producer.  Up until June 30, 2015, petitioner received monthly alimony and child support from him pursuant to a settlement agreement they

---

[1](...continued)
the nearest dollar.

[2]We note the Taxpayer First Act, Pub. L. No. 116-25, sec. 1001, 133 Stat. at 983 (2019), changed the name of the IRS Office of Appeals to the IRS Independent Office of Appeals, effective as of July 1, 2019.

[*3] entered into and filed with the Superior Court of California in Los Angeles County (Los Angeles County court) in 2012 (2012 support agreement) in connection with their divorce proceedings in that court. As further discussed infra, thereafter and up until at least approximately one month before Appeals' determination, Mr. Sellers continued to financially support petitioner (and their daughter).

Petitioner's unpaid Federal income tax liability for 2009 stems from the IRS' determination that a $25,061 deduction for mortgage interest that she claimed on her Federal income tax return for 2009 should be disallowed. A statutory notice of deficiency dated October 24, 2011, that was addressed to petitioner at an address in Pacific Palisades, California, reflects that determination. She did not file a petition with this Court seeking to challenge it.

Petitioner's unpaid Federal income tax liability for 2012 is the result of reporting tax due on her Federal income tax return for 2012 and not remitting payment for this liability when she filed that return.

II. IRS' Collection Action

On December 31, 2014, after assessment and notice and demand for payment of petitioner's outstanding liabilities for the years at issue, the IRS sent her in care of Steven Mather (one of her counsel of record in this case) a Letter

[*4] 1058, Final Notice of Intent to Levy and Notice of Your Right to a Hearing (levy notice). The levy notice advised petitioner that the IRS intended to levy to collect her outstanding liabilities for the years at issue which, through the date of the levy notice, totaled $55,036, and that she had the right to a hearing to appeal the proposed collection action. The levy notice also advised petitioner that the IRS might file a notice of Federal tax lien at any time to protect its interest.

In response to the levy notice, petitioner timely submitted Form 12153, Request for a Collection Due Process or Equivalent Hearing (CDP hearing request). The CDP hearing request did not challenge the underlying liabilities but did request collection alternatives of an installment agreement, an offer-in-compromise, and "I Cannot Pay Balance", and further requested that a CDP hearing be held with petitioner's authorized representative, Enrolled Agent James J. Keating.[3] As the reason for the CDP hearing request, the form stated:

> Ms. Margolis intends to proffer a specific alternative resolution, but does not know what is appropriate at this time. Ms. Margolis' finances are such that she does not know if she can maintain a payment plan. She will submit a specific resolution after her financial circumstance is analyzed and before the Collection Due Process conference.

---

[3]Mr. Keating is associated with the same law firm as Mr. Mather.

**[*5]**  A representative from Appeals acknowledged receipt of petitioner's CDP hearing request by letter to petitioner dated March 24, 2015 (with a copy to Mr. Keating), and the request was assigned to Settlement Officer Minnie Banks (SO Banks).

On March 31, 2015, SO Banks sent petitioner a letter (with a copy to Lydia B. Turanchik[4]) in which she scheduled a telephone CDP hearing on May 7, 2015. She also indicated that the scheduled hearing was petitioner's opportunity to discuss with her the reasons petitioner disagreed with the proposed collection action or to discuss collection alternatives.  In the letter SO Banks outlined the issues she had to consider during the hearing and informed petitioner that in order for her to consider collection alternatives, petitioner needed to provide to her on or before May 1, 2015, the following information:  (1) if she wished to submit an offer-in-compromise, a completed Form 656, Offer in Compromise, together with the $186 application fee and all other required fees per new offer laws; (2) a completed Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, together with wage statements and supporting documentation for each section of the form for the last three months; and (3) if she

---

[4]Ms. Turanchik is also petitioner's counsel of record in this case and with the same law firm as Mr. Mather.

[*6] proposed an installment agreement, the monthly proposed amount and the proposed day of the month for the monthly payment.  Finally, SO Banks informed petitioner that if she preferred to reschedule the hearing or have another type of conference (i.e., a correspondence or a face-to-face conference), she should let SO Banks know by April 14, 2015.

In response to SO Banks' March 31, 2015, letter, Mr. Keating faxed her a letter dated April 29, 2015, requesting a face-to-face conference in Los Angeles, California, and enclosing a completed Form 433-A (April Form 433-A) for petitioner.  In section 4 of the April Form 433-A petitioner indicated that she maintained a Bank of America checking account but did not indicate the account's balance.  Also in section 4 of that form petitioner indicated that she had (1) available credit (from an American Express credit card) of $1,500, (2) a 2013 Volvo with no equity, and (3) "household furnishings/clothing" valued at $5,000.

In section 5 of that form petitioner listed various monthly income and living expense items.  With respect to the monthly income items, petitioner indicated that she had total monthly income of $7,920, consisting of net business income of –$6,580, child support of $3,500, and alimony of $11,000.  With respect to total monthly living expense items, petitioner indicated that she had total monthly living expenses of $10,962, consisting of food, clothing, housekeeping supplies,

[*7] personal care products, and miscellaneous expenses[5] of $1,092; housing and utility expenses of $5,000; vehicle ownership expenses of $335; vehicle operating expenses of $295; out-of-pocket health care expenses of $1,910; and child and dependent care expenses of $2,330. Since she indicated on the form that she was self-employed, petitioner completed section 7 of the form (pertaining to sole proprietorship information). In this section she indicated that she had zero monthly business income and total monthly business expenses of $6,580,[6] consisting of rent of $1,080, utilities (including business internet) and telephone expenses of $300, vehicle gasoline and oil expenses of $200, and other expenses of $5,000.

On May 5, 2015, SO Banks called Mr. Keating, leaving him a voicemail saying that petitioner's case would be transferred to Appeals in Los Angeles for a face-to-face conference. Settlement Officer Nathan August (SO August) from Appeals in Los Angeles was assigned to petitioner's CDP hearing request.

---

[5]So-called miscellaneous expenses are those living expenses that are not included in any other category of living expense items shown in section 5 of the form, such as credit card payments, bank fees and charges, reading material, and school supplies.

[6]This is the same amount listed in section 5 of the form for net business income.

**[*8]**   On June 15, 2015, SO August sent petitioner a letter (with a copy to Mr.

Keating) in which he scheduled a face-to-face hearing for September 22, 2015.

Additionally, as SO Banks had done in her March 31, 2015, letter, SO August

outlined the issues he had to consider during the hearing.  Furthermore, he

informed her that Appeals might ask the IRS Office of Collection (Collection) to

review, verify, and provide its opinion on any of the information she had

submitted (or might later submit) and that she would have an opportunity to

respond to Collection's comments.

Collection reviewed the April Form 433-A.  On August 24, 2015, SO

August sent to petitioner a letter (with a copy to Mr. Keating) in which he shared

with her the results of Collection's review of her financial information.  The letter

stated:

> The results of Collection's review of your financial information are as
> follows:
> "Review of the FIN [financial information] in regards to income vs.
> expenses alone shows TP [taxpayer] can pay $3548.00/mo."
> "This payment is based on the taxpayer's stated net monthly income
> of $14,500 minus the taxpayer's share of the claimed expenses of
> $10,952."[7]

---

[7]Collection denied petitioner's stated monthly net business income of
−$6,580.  We also note that Collection (likely inadvertently) erroneously stated
that petitioner's claimed expenses were $10,952; petitioner's April Form 433-A
indicates that her claimed expenses were $10 more--$10,962.

**[*9]** "The additional documentation that they provided did not support the TP's additional claimed expenses as necessary therefore their financial statement does not support their request for CNC [Currently Not Collectible] status."

If you disagree with the results, tell me what you disagree with and why you disagree by September 8, 2015. I'll consider Collection's review and your response before making a decision in your Collection Due Process hearing.

In response to SO August's August 24, 2015, letter, Mr. Keating faxed him a letter dated September 8, 2015, detailing why he disagreed with Collection's review of petitioner's financial information and enclosing two spreadsheets reflecting various charges to her Bank of America checking account and her American Express credit card from January 1 to June 30, 2015. The spreadsheets included sections titled "Business", "Medical", and "Food", as well as a section titled with her daughter's name.[8] The "Business" section included entries for various amounts on various dates for "NetFlix", "Restaur't" (as well as "Restaurant" and "Rest't"), "Present'n", "BusSuppl" and "BusSrvs" , "Bloomdale", "Clothes" and "Clothing", "Hair" and "Nails", "Sephora" and "Aveda", "Gas", "Hulu", "Parking", and "Amazon". The "Medical" section included entries for various amounts on various dates for "Counsel'g", "Insurance", "LAPC" and "LAPC Fnd", "EdTher'py" and "EDTh'rapy",

---

[8]Her daughter's name has been properly redacted pursuant to Rule 27(a)(3).

[*10] "Amazon", "Optom'ist", "RichardMD", "LA Fitness", and "Pharm". The "Food" section included entries for various amounts on various dates for "Gelson's", "Ralph's", "WholeFds", "BristolFrm", "S'fish Sush", "LA Bite", "Chipotle", "TGIFridays", and "Sprouts". The section titled with petitioner's daughter's name included entries for various amounts on various dates for "iTunes", "Amazon", "LuLuLemon", "Equinox", "Uber", "Barney's", "UrbanOut", "SwimWear", "ESNails", "Verizon", "Michaels", "Sephora", and "Sch'l Supp".

Mr. Keating asserted in his September 8, 2015, letter that Collection's analysis of petitioner's ability to pay was flawed and that she was unable to make monthly installment payments. On the basis of the spreadsheets, he stated that petitioner's total monthly living expenses were actually $18,211. Mr. Keating also stated that petitioner used her own and borrowed funds to pay her self-employment-related expenses and that her alimony payments from Mr. Sellers ended as of June 30, 2015, but she was "attempting to reopen that aspect of her divorce"; child support from Mr. Sellers for their daughter was continuing.

The face-to-face CDP hearing took place as scheduled. During the hearing SO August asked Mr. Keating what petitioner was proposing in order to resolve her outstanding liabilities. In response Mr. Keating requested that it be

**[*11]** determined she is unable to pay. SO August questioned Mr. Keating about the alimony from Mr. Sellers and whether petitioner was making any money from her business pursuits. In response Mr. Keating reiterated that the court-approved alimony had stopped as of June 30, 2015, and that although petitioner had petitioned the Los Angeles County court for more alimony payments, he was unsure of the status of that action or how much Mr. Sellers was willing to continue to pay. Upon further questioning from SO August, Mr. Keating also stated that he was unsure whether petitioner had received any alimony from Mr. Sellers since June 30, 2015. At SO August's request, Mr. Keating agreed to submit to him copies of the petition filed in the Los Angeles County court for continued alimony (2015 support petition) and the 2012 support agreement.

Regarding petitioner's business pursuits, Mr. Keating stated that she was making only "nickel and dimes" from these pursuits, and that the only money coming into her household was the monthly child support of $3,500; she was having to borrow from family and friends to pay her monthly living expenses.

During the hearing SO August also questioned the monthly out-of-pocket health care expenses indicated on petitioner's April Form 433-A. In response Mr. Keating stated that petitioner paid monthly health insurance and spent a lot of time in counseling, which was not covered by insurance. Mr. Keating further stated

[*12] that the counseling, which consisted of meditation sessions, was for a "stress-related issue". Mr. Keating also noted that he believed petitioner used marijuana for medical use, which similarly was not covered by insurance. SO August requested that he be provided a letter from a doctor addressing why petitioner needed to take the counseling sessions and why to the extent to which she was taking them.

Upon inquiry from Mr. Keating, SO August informed him that petitioner's outstanding balance for her Federal income tax liabilities for the years at issue and 2013 totaled $115,000.[9] Mr. Keating then indicated that petitioner's Federal income tax return for 2014, which was due to be filed (on extension) by October 15, 2015, would likely show tax due of approximately $25,000 (attributable to alimony income). He speculated that for her to pay these combined liabilities over 72 months, petitioner would need to pay $2,000 monthly. In response SO August asked whether that was petitioner's proposed installment agreement. Mr. Keating stated that such an agreement would be "financially difficult" for her but it was a "doable option."

Given the apparent change in monthly alimony since submission of the April Form 433-A and not fully understanding the monthly expense items

---

[9]Petitioner's 2013 liability is not at issue in this case.

**[*13]** indicated on the form, SO August requested that Mr. Keating submit to him an updated Form 433-A.  Mr. Keating agreed to do this, and SO August set a deadline of October 6, 2015, for the submission of this form and the other requested documentation.  The hearing was continued to allow SO August to receive and review the additional information.

On October 6, 2015, Mr. Keating hand-delivered a letter and other documents (October 6, 2015, materials) to SO August.  On this occasion they discussed petitioner's monthly out-of-pocket health care expenses.  Mr. Keating noted that she purchased her medical marijuana at the LAPC Foundation, that she regularly saw a "life coach", and that her daughter had chronic back problems and was going to an Equinox fitness facility for treatment.  Mr. Keating stated that petitioner's medical expenses totaled $4,390 monthly and that her daughter's medical expenses totaled $500 monthly.  In response SO August told Mr. Keating that these expenses were too high and not reasonable.

SO August and Mr. Keating also discussed petitioner's receipt of alimony from Mr. Sellers.  Mr. Keating confirmed that petitioner had filed the 2015 support petition with the Los Angeles County court on September 10, 2015.[10]  However,

---

[10]One of the other documents Mr. Keating hand-delivered to SO August was a copy of that petition.

**[\*14]** SO August noted that he still had not received a copy of the 2012 support agreement.  In response Mr. Keating stated that he would provide it.  He also indicated that Mr. Sellers had recently paid petitioner $100,000 in alimony to rectify previous improper payments of alimony, and among the other documents that he hand-delivered to SO August were copies of two checks from Mr. Sellers that petitioner had deposited into her Bank of America checking account--a check for $59,000 and a check for $41,000 (both dated August 17, 2015).  Mr. Keating noted that petitioner needed these funds to pay her living expenses for the next 10 months.

Mr. Keating further indicated that on August 12, 2015, Mr. Sellers gave petitioner a cashier's check for $32,000,[11] which she deposited into her Bank of America checking account, for her to pay her 2014 Federal income tax liability of $25,000 and 2015 estimated tax of $8,000.  Upon inquiry from SO August, Mr. Keating acknowledged that she had not yet made those tax payments; but he proposed that once she made them, she could pay $300 monthly for one year followed by an increase to $1,900 monthly for the remaining 60 months to satisfy

---

[11]One of the other documents Mr. Keating hand-delivered to SO August was a copy of this cashier's check.

**[*15]** her liabilities for the years at issue (and 2013) because it was more than likely she would get a job in the next 12 months.

SO August reiterated that petitioner needed to submit to him an updated Form 433-A, as well as proof that she had paid her 2014 liability and 2015 estimated tax. He further requested that petitioner make a $50,000 payment now towards her outstanding liabilities for the years at issue from the $100,000 she had just received from Mr. Sellers. He stated that once she had done that they could arrange an installment agreement on the remaining balance due. In response Mr. Keating expressed disagreement with SO August's request, stating that petitioner needed that money to live on because it was not known when she would be receiving continued monthly alimony from Mr. Sellers; nevertheless, he agreed to discuss the offer with her and also agreed that she needed to use the additional $32,000 she had just received from Mr. Sellers to pay her 2014 tax liability and 2015 estimated tax. SO August gave petitioner a deadline of October 13, 2015, to submit an updated Form 433-A and the other requested information; and he informed Mr. Keating that he would sustain the proposed levy if they did not reach an agreement with respect to an installment agreement by then.

On October 8, 2015, SO August reviewed the October 6, 2015, materials. In addition to Mr. Keating's October 6, 2015, letter and copies of the 2015 support

[*16] petition, the two checks totaling $100,000, and the $32,000 cashier's check, the October 6, 2015, materials included: (1) a letter from petitioner's doctor in Los Angeles dated September 28, 2015, regarding her health problems and their treatment, (2) a list of various prescription medications she had purchased from a Los Angeles pharmacy, (3) a spreadsheet reflecting various "medical expense charges" for her and her daughter to her American Express credit card from January 1 to September 9, 2015, and (4) a spreadsheet reflecting various "medical expense payments" she made from her Bank of America checking account for herself and her daughter from January 2 to September 9, 2015.

In his October 6, 2015, letter Mr. Keating reiterated what he had said when he and SO August met that same day. He further noted that petitioner was beset by a number of ailments, including depression and attention-deficit hyperactivity disorder for which she was taking prescription medication, although her doctor preferred that she seek other alternative treatments for these problems, such as counseling with a life coach through an organization in Los Angeles called Objet d'Art & Spirit. Mr. Keating concluded the letter by requesting that petitioner be put in currently not collectible (CNC) status; he requested in the alternative a 72-month installment agreement for the approximately $115,000 balance of petitioner's tax liabilities for the years at issue and 2013, beginning with monthly

[*17] payments of $300 or less for the first 12 months and then increasing to an unspecified larger monthly amount to allow for amortization of the balance over 72 months.

Mr. Keating faxed a letter to SO August dated October 13, 2015, enclosing an updated Form 433-A from petitioner dated October 12, 2015 (October Form 433-A), a copy of the prescription medication list that was part of the October 6, 2015, materials, copies of the 2015 support petition and the 2012 support agreement, and bank statements with respect to her Bank of America checking account from May 6 to September 29, 2015 (October 13, 2015, materials).

On October 27, 2015, SO August reviewed the October 13, 2015, materials. In section 4 of the October Form 433-A petitioner now indicated that she maintained a Bank of America checking account with a balance of $32,065 as of September 28, 2015.  Also in section 4 of that form petitioner now indicated that she had available credit (from the same American Express credit card indicated on

[*18] the April Form 433-A) of $1,384 with an amount owed of $7,782[12] as of October 9, 2015.

In section 5 of the October Form 433-A petitioner now indicated that she had total monthly income of $1,145 and total monthly living expenses of $17,542. Her monthly income consisted solely of child support (whereas she had indicated on the April Form 433-A net business income of –$6,580, child support of $3,500, and alimony of $11,000). On the basis of his review of the October 13, 2015, materials SO August noted that the 2012 support agreement provided that Mr. Sellers would pay monthly child support of $3,500 until their daughter attained the age of 18 but the October 13, 2015, materials provided no explanation for the child support discrepancy. Her monthly living expenses were identical to what she had indicated on the April Form 433-A except that she now also indicated other expenses of $6,580[13] (which were her business expenses attributable to her self-employment activities in television and film production).

_____

[12]In this section she also indicated, however, that the credit limit on this credit card was $1,500. This likely is an erroneous notation, having been inadvertently "carried over" from the April Form 433-A. We also note that, just as in section 4 of the April Form 433-A, petitioner indicated in section 4 of the October Form 433-A that she had a 2013 Volvo with no equity and "household furnishings/clothing" valued at no more than $5,000.

[13]The $6,580 is the same amount reflected elsewhere on the April Form 433-A.

**[*19]** Petitioner's bank statements from May 6 to September 29, 2015, reflected the $100,000 and $32,000 deposits discussed supra. These statements also showed a beginning balance of $23,790 with $134,301 in deposits and other additions to her account and subtractions and withdrawals totaling $88,766. Upon review of these statements SO August noted that petitioner was not reserving the $100,000 to cover her living expenses for the next 10 months as Mr. Keating had asserted; the statements showed repeated withdrawals at a casino in Rancho Mirage, California, and excessive charges at various restaurants, clothing stores, and nail and spa salons.

On November 30, 2015, SO August examined the IRS' Integrated Data Retrieval System (IDRS) in order to verify whether petitioner had filed her 2014 Federal income tax return and paid the tax due on that return and the 2015 estimated tax. IDRS showed that while petitioner had filed her 2014 return she had not paid the tax due of $30,361 reflected on that return nor had she made any estimated tax payments for 2015.

On the same day SO August called Mr. Keating to inquire as to the results of the court hearing with respect to the 2015 support petition, which should have taken place on November 23, 2015. Mr. Keating informed him that the hearing was continued until the end of February 2016. During the conversation SO

[*20] August informed Mr. Keating that petitioner had not paid her 2014 tax liability or any 2015 estimated tax and requested that she now use the $32,000 she had received from Mr. Sellers to pay her outstanding liabilities for the years at issue by December 7, 2015, or else he would sustain the proposed levy. He also noted that petitioner was quickly spending the $100,000 rather than reserving it to pay monthly living expenses in the future as he had represented she would do. Mr. Keating acknowledged that petitioner was compulsively spending money and that her not taking care of her tax responsibilities was unacceptable, and he stated he would alert her to the December 7, 2015, deadline. Upon SO August's inquiry, Mr. Keating also agreed to get clarification from petitioner regarding a $35,000 check she had written on August 28, 2015, and the child support discrepancy.

Mr. Keating faxed SO August a letter dated December 6, 2015, and other documents (December 6, 2015, materials). On December 21, 2015, SO August reviewed the December 6, 2015, materials. In his December 6, 2015, letter Mr. Keating confirmed that the hearing with respect to the 2015 support petition had been continued until February 23, 2016, and that Mr. Sellers' child support payments had been reduced to $1,800 monthly. He also stated that petitioner had repaid certain loans to individuals she viewed as "life-lines" (i.e., individuals that she would likely call upon for financial support again) and that she anticipated that

[*21] her "current wretched financial circumstance" would continue for some time. Mr. Keating reiterated his request that petitioner be placed in CNC status because she was currently unable to pay either her delinquent or current income tax.

Copies of petitioner's bank statements for her Bank of America checking account from September 5 to November 30, 2015, were part of the December 6, 2015, materials. On the basis of his review of these statements, SO August concluded that petitioner had spent in less than two months the $32,000 she had deposited on August 12, 2015, and the $100,000 she had deposited on August 25, 2015. SO August also reviewed section 301.6343-1(b)(4), Proced. & Admin. Regs., relating to release of a levy because of economic hardship, including the additional requirement under subparagraph (4)(iii) that the taxpayer act in good faith in order to obtain such a release. SO August noted that petitioner was not acting in good faith because she had dissipated $132,000 in two months while her CDP hearing request was pending, in total disregard of her tax obligations and her claimed monthly living expenses. He calculated that if she had not dissipated the $100,000 she had received from Mr. Sellers she could pay $2,262 monthly towards her outstanding tax liabilities for the years at issue. He concluded that (1) petitioner's proposed installment agreement should be denied, (2) she did not

[*22] qualify for CNC status because she failed to meet the good faith requirement of section 301.6343-1(b)(4)(iii), Proced. & Admin. Regs., and (3) the proposed levy should be sustained. He then proceeded to close petitioner's case.

While in the process of closing petitioner's case, SO August continued to consider the economic hardship issue. On December 23, 2015, he reviewed several Tax Court opinions involving economic hardship and the dissipation of assets. On December 28, 2015, he determined that he should get a legal opinion from the IRS Office of Chief Counsel (Chief Counsel's Office) on whether his application of the good faith requirement was reasonable and appropriate given the circumstances of petitioner's case and whether the Chief Counsel's Office would support his determination if petitioner filed a Tax Court petition. That same day he prepared a memorandum to that effect and emailed it to Associate Area Counsel Kathryn Ankeny in Los Angeles.

On February 24, 2016, SO August received and reviewed Chief Counsel's Office's opinion, which concluded the following: (1) further investigation was required to determine whether petitioner had violated the good faith requirement; (2) it would support his general determination to sustain the proposed levy if petitioner did not substantiate certain expenses; and (3) SO August should request written verification from petitioner that she wished only to be placed in CNC

[*23] status; and if that was not the only requested collection alternative, the reasonable collection potential calculation should include dissipated funds not used for payment of necessary items and that calculation should not include petitioner's net business loss per Internal Revenue Manual (IRM) pt. 5.15.1.11(2)(c) (Nov. 17, 2014).

On the basis of the Chief Counsel's Office's opinion, SO August sent petitioner a letter (with a copy to Mr. Keating and Mark Baumohl[14]) dated March 7, 2016, requesting that she submit the following information or documents to him by March 21, 2016: (1) the results of the February 23, 2016, hearing with respect to the 2015 support petition, including a copy of any corresponding court order; (2) copies of canceled checks for purported loan repayments she had made to individuals from the $132,000; (3) a copy of the $35,000 canceled check; (4) copies of bank statements for her Bank of America checking account from December 2015 through February 2016; (5) a list of the assets purchased from Objets d'Art & Spirit and their current market values; (6) a copy of her insurance

_____

[14]According to SO August's case activity record, the IRS' computerized records showed that as of September 7, 2015, Mr. Baumohl became a new authorized representative for petitioner for 2012 to 2014. Aside from this letter, Mr. Baumohl was copied on only two other IRS documents--a letter from SO August to petitioner dated May 5, 2016, and Appeals' notice of determination.

[*24] policy contract covering her personal assets; and (7) an express statement as to whether she had withdrawn her request for an installment agreement.

In response to SO August's March 7, 2016, letter Mr. Keating faxed a letter dated March 21, 2016, and other documents to SO August. The documents were: (1) copies of petitioner's canceled checks from repaying loans to individuals she viewed as "life-lines", (2) printed pages from the Objets d'Art & Spirit website and a news article about its owner, (3) bank statements for petitioner's Bank of America checking account from November 4, 2015, to March 8, 2016, and (4) a copy of the first page of her homeowners policy for rental insurance from Travelers Commercial Insurance Co. No explanatory list of items purchased from Objets d'Art & Spirit was provided.

On March 22, 2016, SO August reviewed Mr. Keating's March 21, 2016, letter. In this letter Mr. Keating confirmed that petitioner had not yet been successful in reinstating the alimony and that because she believed Mr. Sellers owed her a significant amount of both alimony and child support she had hired a forensic accountant to review his income statements to determine whether additional funds were due. Mr. Keating reiterated that petitioner had repaid loans to certain individuals who she viewed as "life-lines". He also provided background information on Objets d'Art & Spirit and stated that it served as her

[*25] "spiritual oasis."  Finally, Mr. Keating stated without further detail that petitioner did not have much in the way of valuable items (but that she had a dog, a German Shepherd).

On April 7, 2016, SO August reviewed the bank statements that Mr. Keating had faxed to him with his March 21, 2016, letter.  The statements showed deposits of $30,514 from November 4 through December 7, 2015 (including online banking transfers of $5,000 and $10,000 from Mr. Sellers on November 12 and December 3, 2015, respectively); $17,853 from December 8, 2015, through January 5, 2016 (including an online banking transfer of $10,000 from Mr. Sellers on December 15, 2015); $16,800 from January 6 through February 3, 2016 (including an online banking transfer of $10,000 from Mr. Sellers on January 21, 2016); and $36,800 from February 4 through March 8, 2016 (including online banking transfers of $5,000 from Mr. Sellers on February 12 and 17, 2016).  SO August noted that these deposits for the most part were apparently online banking transfers from Mr. Sellers to petitioner as alimony and child support which had continued despite Mr. Keating's continued claim that petitioner was in a financial

[*26] hardship situation.[15] He also noted that these deposits averaged out to $25,500 monthly over that four-month period.

On April 11, 2016, SO August and Mr. Keating spoke by telephone. SO August relayed to Mr. Keating what he had gleaned from reviewing petitioner's most recently submitted bank statements. He stated that on the basis of petitioner's receiving nearly $102,000 from Mr. Sellers from November 2015 through February 2016 she was not in a financial hardship situation; she could pay $5,622 monthly. In response Mr. Keating stated that petitioner would not agree to an installment agreement with that monthly payment amount because she could not pay; if anything she could either pay less or could not make any payments towards her delinquent taxes. In reply SO August stated that because petitioner was not willing to accept paying $5,622 monthly, he would sustain the proposed levy and a notice of determination would be issued to that effect.

Later that day Mr. Keating faxed a letter to SO August following up on SO August's deposit analysis. He reiterated that petitioner's alimony had stopped on June 30, 2015, and he stated that the deposits shown on petitioner's bank

---

[15]In each of these months the statements showed one or more "counter credits". The record is unclear, however, as to whether these credits also represent payments from Mr. Sellers to petitioner. It appears that SO August characterized them as such.

**[*27]** statements were not current alimony payments from Mr. Sellers but rather late child support payments from him in response to an analysis done by a forensic accountant she had hired. He also reiterated how petitioner had been compelled to borrow from friends and family to meet living expenses and that upon receipt of the delinquent payments from Mr. Sellers she repaid those individuals she viewed as "life-lines". Finally, he stated that he would contact petitioner to inquire about her ability to pay $5,622 monthly but requested that SO August consider lowering the monthly payment for the first 12 months and then increasing it to a higher amount commencing in the 13th month. He did not specify any dollar amounts with respect to his purported counteroffer.

On April 12, 2016, Mr. Keating faxed another letter to SO August in which he continued to question SO August's deposit analysis, together with a spreadsheet showing all deposits into petitioner's Bank of America checking account from July through December 2015. In this letter he stated that she had deposited $239,114 into that account during that period and of that amount approximately $74,000 was reimbursement from Mr. Sellers for "excess IRS/FTB income taxes charged to" petitioner with the remaining $165,114 being "back" child support for 2012 through mid-2015. According to Mr. Keating, none of the

[*28] deposits were alimony. In the letter he also noted what petitioner had told him, stating:

> Ms. Margolis writes: "Dylan owed me 221k in child support from 2012. He has been paying me some of it every month to pay off the debt and to give me enough to live on and support my child who lives with me 90% of the time. Paying off that debt is how I've survived this last year!"

Mr. Keating concluded his letter by stating that petitioner was currently receiving only $5,500 monthly in child support from Mr. Sellers; she was not receiving alimony at this time.

On the basis of his review of Mr. Keating's April 12, 2016, letter and the attached spreadsheet, SO August determined that he wanted to review petitioner's bank statements from March 9 through May 9, 2016, to confirm whether Mr. Keating's assertions were correct before making a final determination. On May 5, 2016, SO August sent petitioner a letter (with copies to Mr. Keating and Mr. Baumohl) requesting copies of her bank statements for that period. He requested that she provide these statements to him by May 19, 2016.

Mr. Keating faxed a letter to SO August dated May 19, 2016, together with a copy of a spreadsheet showing deposits made to petitioner's Bank of America checking account from January 1 to May 6, 2016, and a copy of her bank statement with respect to that account from April 6 to May 6, 2016. On May 23,

[*29] 2016, SO August reviewed these materials. In his May 19, 2016, letter Mr. Keating stated that petitioner had received payments totaling $34,000 from Mr. Sellers in April 2016 and that according to her the amounts he was currently paying her were solely current and delinquent child support (and not alimony). He further stated that from January 1 through April 30, 2016, petitioner made deposits totaling $90,370 into her Bank of America checking account ($16,800 in January 2016, $11,800 in February 2016, $26,870 in March 2016, and $34,900 in April 2016) for an average monthly total deposit of $22,600. The spreadsheet showed the source of many of these deposits; to wit, Mr. Sellers was the source of the following: $10,000 on January 21, 2016, $1,800 on February 1, 2016, $5,000 on February 12, 2016, $5,000 on February 17, 2016, $1,800 on March 1, 2016, $25,000 on March 4, 2016, $1,800 on April 1, 2016, $9,000 on April 4, 2016, $6,500 on April 8, 2016, $17,600 on April 28, 2016, and $13,500 on May 6, 2016.

SO August also re-reviewed Mr. Keating's April 12, 2016, letter. Comparing this letter with Mr. Keating's May 19, 2016, letter he noted that petitioner should have received only $5,500 of child support from Mr. Sellers in April 2016, yet she had received $34,900 from him that month and $13,500 from him so far in May 2016. SO August concluded petitioner was continuing to receive significant payments from Mr. Sellers and was not in a financial hardship

[*30] situation; on the basis of his analysis she could afford to pay $11,732 monthly ($34,900 monthly income minus allowable monthly living expenses totaling $23,168).[16]

On that same day SO August and Mr. Keating spoke by telephone. SO August informed Mr. Keating that according to his April 16, 2016, letter all of the back child support that Mr. Sellers owed to petitioner should have been paid to her by mid-March 2016, yet in April and May 2016, she deposited a total of $48,400 into her Bank of America checking account from Mr. Sellers. In response Mr. Keating stated that he had asked petitioner about that discrepancy and was told that there had been "continuous digging" of Mr. Sellers' books and records in order to get him to pay her more. SO August replied that he had no confidence in what petitioner was relaying, pointing out that she had received a $13,500 payment from Mr. Sellers on May 6, 2016. SO August informed Mr. Keating that on the basis of his analysis petitioner was not in a financial hardship situation and could afford to pay $11,732 monthly.

---

[16]SO August noted that the monthly income consisted of child support of $5,500 and other income from Mr. Sellers of $29,400; the allowable monthly expenses consisted of food, clothing, and miscellaneous expenses of $1,083, housing and utility expenses of $5,000, vehicle ownership expenses of $335, vehicle operating expenses of $295, out-of-pocket health care expenses of $1,910, taxes of $12,215, and child and dependent care expenses of $2,330.

[*31] Mr. Keating disagreed, stating that $11,732 monthly would simply be too much for petitioner to pay. He did not make an alternative payment proposal. Since they could not agree on the terms of an installment agreement, SO August told Mr. Keating that he was sustaining the proposed levy and a notice of determination would be issued.

Appeals issued a notice of determination dated June 3, 2016, to petitioner (with copies to Mr. Keating and Mr. Baumohl); the notice of determination rejected her proposed installment agreement (and effectively rejected her request to be placed in CNC status) and sustained the proposed levy for the years at issue. A summary detailing the matters considered by Appeals and its conclusions was attached to the notice of determination. In pertinent part, it outlined the various statements Mr. Keating had made in his letters, the extensive conversations SO August had had with Mr. Keating, and what petitioner's bank statements showed. It also included the following tables:

**[*32] INCOME & EXPENSE TABLES**

**Monthly Income**

| Source | Taxpayer Form 433-A 04/21/2015 | Taxpayer Form 433-A 10/12/2015 | Appeals |
|---|---|---|---|
| Net Business | <$6,580> | 0 | 0 |
| Alimony | 11,000 | 0 | 0 |
| Child Support | 3,500 | $1,145 | $5,500 |
| Other from ex-husband Dillan [sic] Sellers | --- | --- | 29,400 |
| **TOTAL** | 7,920 | 1,145 | 34,900 |

**Monthly Expenses**

| Items | Taxpayer Form 433-A 04/21/2015 | Taxpayer Form 433-A 10/12/2015 | Appeals |
|---|---|---|---|
| **National Standard** | $1,092 | $1,092 | $1,083 |
| **Housing & Utilities** | 5,000 | 5,000 | 5,000 |
| **Transportation** | | | |
| Ownership Cost | 335 | 335 | 335 |
| Operating Cost | 295 | 295 | 295 |
| **Health Care Insurance** | 0 | 0 | 0 |
| **Out of Pocket Health Care** | 1,910 | 1,910 | 1,910 |
| **Taxes** | 0 | 0 | 12,215 (35%) |

[*33]

| | | | |
|---|---|---|---|
| **Child/ Dependent Care** | 2,330 | 2,330 | 2,330 |
| **Life Insurance** | 0 | 0 | 0 |
| **Other Expenses** Net business loss | --- | 6,580 | 0* |
| **TOTAL** | 10,952 | 17,542 | **23,168** |

*Taxpayer operates a loss creating business, not a revenue generating one to contribute to household income, therefore the expense claim is disallowed. [IRM 5.15.1.11(c).]

Monthly ability to pay per taxpayer: $0
Monthly ability to pay per Appeals: $11,732
　　[Alteration in original.]

Finally, it made the following conclusion:

**BALANCING ACTION**

Taxpayer is not in a financial hardship condition and the taxpayer's proposed installment agreement collection alternative is rejected because the taxpayer won't agree to Appeals' finding of her ability to pay amount. Therefore, Collection's plan to levy balances the need for efficient collection of tax with the legitimate concern of the taxpayer that any collection action be no more intrusive than necessary. The proposed levy action by Collection is sustained.

Petitioner timely filed a petition with this Court for review of the notice of determination.

**[*34]**                                    OPINION

I.     <u>General Legal Principles</u>

A.     <u>CDP Review Procedure for a Proposed Levy</u>

Under section 6331(a), if any person liable to pay any tax neglects or refuses to do so after notice and demand, the Commissioner is authorized to collect the unpaid amount by way of a levy upon all property and rights to property belonging to such person or upon which there is a lien. Pursuant to section 6330(a), the Commissioner must provide the person with written notice of an opportunity for an administrative hearing to review the proposed levy.

If an administrative hearing is requested in a levy case, the hearing is to be conducted by Appeals. Sec. 6330(b)(1). At the hearing the Appeals officer conducting it must obtain verification that the requirements of applicable law and administrative procedure have been met. Sec. 6330(c)(1). The taxpayer may raise at the hearing any relevant issue relating to the unpaid tax or the proposed collection action, including spousal defenses, challenges to the appropriateness of the proposed collection action, and collection alternatives such as an installment agreement. Sec. 6330(c)(2)(A). Following the hearing the Appeals officer must determine among other things whether the proposed collection action is appropriate. In reaching the determination the Appeals officer must take into

**[\*35]** consideration: (1) whether the requirements of applicable law and administrative procedure have been met; (2) all relevant issues raised by the taxpayer, including offers of collection alternatives such as an installment agreement; and (3) whether any proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of the taxpayer that collection be no more intrusive than necessary. Sec. 6330(c)(3); see also Lunsford v. Commissioner, 117 T.C. 183, 184 (2001); Ragsdale v. Commissioner, T.C. Memo. 2019-33, at \*19; Levin v. Commissioner, T.C. Memo. 2018-172, at \*24-\*25.

### B. Standard of Review

Section 6330(d)(1) grants this Court jurisdiction to review the determination made by Appeals in a CDP case. If the taxpayer files a timely petition for judicial review, the applicable standard of review depends on whether the underlying tax liability is at issue. Where the taxpayer's underlying tax liability is properly at issue, the Court reviews any determination regarding the underlying liability de novo. Levin v. Commissioner, at \*23 (citing Goza v. Commissioner, 114 T.C. 176, 181-182 (2000)). Where the taxpayer's liability is not properly at issue, we review Appeals' determination for abuse of discretion. Id. (citing Hoyle v.

[*36] Commissioner, 131 T.C. 197, 200 (2008), supplemented by 136 T.C. 463 (2011), and Goza v. Commissioner, 114 T.C. at 182).

Petitioner on brief concedes that she does not challenge her underlying tax liabilities for the years at issue.[17] Thus, because her underlying liabilities are not properly before the Court, we will review Appeals' determination sustaining the proposed levy for abuse of discretion; that is, by analyzing whether the determination was arbitrary, capricious, or without sound basis in fact or law.[18] Ragsdale v. Commissioner, at *20-*21 (and cases cited thereat). We do not conduct an independent review and substitute our own judgment for that of Appeals. Id. at *21 (citing Murphy v. Commissioner, 125 T.C. 301, 320 (2005), aff'd, 469 F.3d 27 (1st Cir. 2006)).

C.    Scope of Review

In nonliability CDP cases that are appealable to the U.S. Court of Appeals for the Ninth Circuit, such as this case, see sec. 7482(b)(1)(G)(i), the scope of our

---

[17]In her petition, petitioner appears to challenge her underlying tax liabilities for the years at issue.

[18]Even if petitioner did seek to challenge her underlying liabilities here, we could not entertain such a challenge because she did not raise the issue of her underlying liabilities before Appeals. See Levin v. Commissioner, T.C. Memo. 2018-172, at *23 n.11 (citing Giamelli v. Commissioner, 129 T.C. 107, 114-115 (2007)).

**[*37]** review is generally limited to the administrative record, see <u>Keller v. Commissioner</u>, 568 F.3d 710, 718 (9th Cir. 2009) (adopting <u>Robinette v. Commissioner</u>, 439 F.3d 455, 459-460 (8th Cir. 2006), <u>rev'g</u> 123 T.C. 85 (2004)), <u>aff'g in part as to this issue</u> T.C. Memo. 2006-166, <u>and aff'g in part, vacating in part</u> decisions in related cases.  This is known as the "administrative record" rule.  Section 301.6330-1(f)(2), Q&A-F4, Proced. & Admin. Regs., defines the administrative record as Appeals' case file, including "any * * * documents or materials relied upon by the Appeals officer * * * in making the determination under section 6330(c)(3)".

Petitioner acknowledges that <u>Keller</u> is applicable here.  Nevertheless, she contends that the Court should have admitted Mr. Keating's testimony into evidence for purposes of supplementing, clarifying, and completing the administrative record.  The Court of Appeals has crafted four "narrow" exceptions to the administrative record rule.  Those exceptions are:  "(1) if admission is necessary to determine 'whether the agency has considered all relevant factors and has explained its decision,' (2) if 'the agency has relied on documents not in the record,' (3) 'when supplementing the record is necessary to explain technical terms or complex subject matter,' or (4) 'when plaintiffs make a showing of agency bad faith.'"  <u>Lands Council v. Powell</u>, 395 F.3d 1019, 1030 (9th Cir. 2005)

**[\*38]** (quoting <u>Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.</u>, 100 F.3d 1443, 1450 (9th Cir. 1996)); <u>see also</u> <u>Meyer v. Commissioner</u>, T.C. Memo. 2013-268, at \*12 n.9 (recognizing these exceptions in the context of review under section 6330(d)(1)). Petitioner has failed to show how the excluded testimony falls within any of these narrowly construed exceptions; the testimony is therefore unnecessary and inappropriate for this case.[19]

II.    <u>Analysis</u>

Petitioner on brief concedes that she does not dispute, and the record shows, that SO August verified that the applicable legal and administrative procedural requirements were met.[20] Petitioner also does not contend that SO August failed to balance the need for efficient tax administration with the intrusiveness of collection for her.

---

[19]Petitioner also asserts that respondent "refused to make [SO] August available" at trial despite petitioner's listing him as a witness, and therefore petitioner is entitled to a presumption that SO August's testimony would not have been favorable to respondent. We reject this argument, seeing as petitioner failed to serve a subpoena on SO August and thus he was not required to appear to testify. The proper procedure for the service of subpoenas on witnesses to attend and give testimony at trial is outlined in Rule 147.

[20]In her petition, petitioner appears to challenge whether SO August verified that the applicable legal and administrative procedural requirements were met.

**[*39]** Petitioner does contend, however, that Appeals' determination to reject her proposed collection alternatives and sustain the proposed levy was an abuse of discretion because blatant errors were committed in evaluating and ultimately rejecting those alternatives. Specifically, petitioner contends that SO August incorrectly analyzed her ability to pay; he incorrectly based his determination on nonrecurring payments when he should have focused only on her Forms 433-A.

A.     Rejection of the Installment Agreement

Section 6159(a) authorizes the Commissioner to enter into written agreements allowing taxpayers to pay tax in installments if he deems that the "agreement will facilitate full or partial collection of such liability." See also Levin v. Commissioner, at *31 (citing Thompson v. Commissioner, 140 T.C. 173, 179 (2013)). The decision to accept or reject installment agreements lies within the discretion of the Commissioner. Id.; see also sec. 301.6159-1(a), (c)(1)(i), Proced. & Admin. Regs. We do not make an independent determination of what would be an acceptable alternative. Levin v. Commissioner, at *31 (citing Murphy v. Commissioner, 125 T.C. at 320). If the Appeals officer follows all statutory and administrative guidelines and provides a reasoned, balanced decision, we will not reweigh the equities. Id. (citing Thompson v. Commissioner, 140 T.C. at 179).

[*40] This court has generally held that there is no abuse of discretion when an Appeals officer relies on guidelines published in the IRM to evaluate a proposed collection alternative, such as an installment agreement. See, e.g., Orum v. Commissioner, 123 T.C. 1, 13 (2004), aff'd, 412 F.3d 819 (7th Cir. 2005); Levin v. Commissioner, T.C. Memo. 2018-172; Scanlon v. Commissioner, T.C. Memo. 2018-51; Tillery v. Commissioner, T.C. Memo. 2015-170; Arede v. Commissioner, T.C. Memo. 2014-29; Maselli v. Commissioner, T.C. Memo. 2010-19; Aldridge v. Commissioner, T.C. Memo. 2009-276; Etkin v. Commissioner, T.C. Memo. 2005-245. When a collection alternative is at issue, IRM pt. 8.22.4.2.1(4) (Nov. 5, 2013) directs an Appeals officer to the appropriate IRM sections covering the administrative policies and procedures relating to that alternative; as relevant here, IRM pt. 5.14.1.4 (Sept. 19, 2014) governs installment agreement acceptance and rejection determinations, and IRM pt. 5.15.1 (Nov. 17, 2014) (Financial Analysis Handbook) provides instructions for securing, verifying, and analyzing financial information of a taxpayer for purposes of determining the taxpayer's ability to pay outstanding tax liabilities.

IRM pt. 5.14.1.4(2) and (4) prescribes that an installment agreement must reflect the taxpayer's ability to pay on a monthly basis throughout the duration of the agreement and that the primary source of information an Appeals officer is to

**[*41]** consider in accepting or rejecting a proposed agreement is the financial information provided by the taxpayer on a collection information statement (i.e., a Form 433-A), along with supporting documentation. The Financial Analysis Handbook directs an Appeals officer to "[a]nalyze the income and expenses [reflected on Form 433-A] to determine the amount of disposable income (gross income less all allowable expenses) available to apply to the tax liability." IRM pt. 5.15.1.2(1) (Nov. 17, 2014).

In evaluating petitioner's proposed installment agreement, SO August (via Collection) first analyzed petitioner's April Form 433-A, along with additional documentation that Mr. Keating provided. After reviewing this information and allowing all claimed monthly expenses (but denying petitioner's claimed net business income of -$6,580), he initially determined that petitioner could pay $3,548 monthly. Upon further discussion with Mr. Keating, SO August learned that petitioner's court-approved alimony had ended on June 30, 2015. After multiple requests for an updated Form 433-A, SO August received the October Form 433-A, along with additional documentation such as certain bank statements with respect to her Bank of America checking account. This form showed no alimony and monthly child support of $1,145. However, while the October Form 433-A did not show any alimony, the bank statements showed that petitioner

**[\*42]** continued to receive lump sums of cash from Mr. Sellers in varying (some of which were significant) amounts after June 30, 2015. Taking into account all of petitioner's financial information, SO August determined that she was not in a financial hardship situation and could afford to pay $11,732 monthly.

We disagree with petitioner that SO August should not have considered these payments from Mr. Sellers in determining her ability to pay because they were nonrecurring payments. We find petitioner's contention to be specious. Even accepting that the alimony payments pursuant to the 2012 support agreement stopped on June 30, 2015, petitioner continued to receive essentially monthly (and apparently indefinitely) cash payments from Mr. Sellers--whenever she was low on disposable income, he would give her money via banking transfer into her Bank of America checking account or via check which she would then deposit into her Bank of America checking account. Indeed, petitioner received $132,000 from him in August 2015 (which lasted until around the end of that year) and then received from him (not considering the monthly child support of $1,800) the following amounts: $5,000 in November 2015, $20,000 in December 2015, $10,000 in January 2016, $10,000 in February 2016, $25,000 in March 2016, $33,100 in April 2016, and $13,500 in May 2016.

**[\*43]** The Financial Analysis Handbook states that an Appeals officer should

"[g]enerally" use all household income in determining a taxpayer's ability to pay.

IRM pt. 5.15.1.11(1) (Nov. 17, 2014). It specifically directs an Appeals officer to

take into account in pertinent part child support, alimony, and other income from

various sources (such as "payments from a trust account, royalties, renting a room,

gambling winnings, sale of property, rent or oil subsidies, etc.") in determining a

taxpayer's ability to pay. Id. pt. 5.15.1.11(2). Additionally, where the taxpayer's

wage income is sporadic or seasonal, it directs the Appeals officer to use the

taxpayer's annual income figure from the Form W-2, Wage and Tax Statement, or

the Form 1040, U.S. Individual Income Tax Return, and divide by 12 to determine

the taxpayer's average monthly income. Id. Petitioner fails to provide any legal

basis for why SO August should have disregarded the aforementioned payments

she received from Mr. Sellers in determining her ability to pay; to the contrary, the

IRM counseled him to do so and he properly followed the IRM. Accordingly, he

committed no abuse of discretion in analyzing petitioner's ability to pay in the

context of evaluating her proposed installment agreement and ultimately

determining that she was not in a financial hardship situation and had a greater

ability to pay than she had proposed. See O'Donnell v. Commissioner, T.C.

Memo. 2013-247, at \*15 ("In reviewing for abuse of discretion, we do not

[*44] recalculate a taxpayer's ability to pay and substitute our own judgment for that of the settlement officer.") (and cases cited threat).

B.      Rejection of CNC Status

In certain circumstances a taxpayer's account can be placed in CNC status, which has the effect of suspending all collection action against that taxpayer. Wright v. Commissioner, T.C. Memo. 2012-24, slip op. at 7.  The IRM outlines procedures that an Appeals officer is directed to follow with respect to placing an account in CNC status.  See IRM pt. 5.16.1.2.9(1) (Aug. 25, 2014) ("An account should not be reported as CNC if the taxpayer has income or equity in assets, and enforced collection of the income or assets would not cause hardship[;]" "[a] hardship exists if a taxpayer is unable to pay reasonable basic living expenses."); see also Rosendale v. Commissioner, T.C. Memo. 2018-99, at *9 (in order to be entitled to have his account placed in CNC status "the taxpayer must demonstrate that, on the basis of his assets, equity, income, and expenses, he has no apparent ability to make payments on the outstanding tax liability"); Foley v. Commissioner, T.C. Memo. 2007-242, slip op. at 6 (same).

As noted supra pp. 41-44, SO August properly determined that petitioner was not in a financial hardship situation and had (at the very least) some ability to make payments on her outstanding tax liabilities for the years at issue.

**[\*45]** Accordingly, SO August committed no abuse of discretion in effectively rejecting petitioner's request to be placed in CNC status.[21]

C.     Other Offers of Collection Alternatives

In addition to requesting an installment agreement and CNC status, petitioner indicated in her CDP hearing request that she was requesting an offer-in-compromise.  The administrative record shows that she did not pursue an offer-in-compromise beyond her initial CDP hearing request.  It is not an abuse of discretion for an Appeals officer to sustain a proposed collection action and not consider collection alternatives when the taxpayer has proposed none.  Kendricks v. Commissioner, 124 T.C. 69, 79 (2005); O'Neil v. Commissioner, T.C. Memo. 2009-183 (finding that the taxpayer discussed an offer-in-compromise with the settlement officer on multiple occasions but failed to submit one in writing); see also sec. 301.7122-1(d)(1), Proced. & Admin. Regs. (requiring that offer must be made in writing and must contain all the information prescribed or requested by

---

[21]During the CDP process SO August considered whether sec. 301.6343-1(b)(4), Proced. & Admin. Regs. (relating to release of a levy because of economic hardship), applies to petitioner's case.  Although the notice of determination does not make an explicit determination as to this issue, we note that the hardship analysis for determining CNC status is essentially the same as that for determining release of a levy because of economic hardship pursuant to sec. 6343 and the corresponding regulations, see Vinatieri v. Commissioner, 133 T.C. 392, 402 (2009), and as indicated above, SO August properly determined that petitioner was not in a financial hardship situation for CNC status purposes.

[*46] the IRS).  Accordingly, it was appropriate for SO August to not consider this collection alternative.

III.    Conclusion

In the light of the above, the Court finds that Appeals did not abuse its discretion in rejecting petitioner's proposed installment agreement and request for CNC status for the years at issue.  The administrative record shows that SO August: (1) verified that all legal and procedural requirements had been met, (2) considered all issues petitioner raised, and (3) determined that the proposed collection action appropriately balanced the need for the efficient collection of taxes with the legitimate concern of petitioner that the collection action be no more intrusive than necessary.  Petitioner is of course free to continue to negotiate with the IRS concerning her liabilities for the years at issue, but she is entitled to only one CDP hearing and Tax Court proceeding with respect to the proposed levy.  See Ragsdale v. Commissioner, at *35 (citing Perrin v. Commissioner, T.C. Memo. 2012-22, slip op. at 8).

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

**[*47]** To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.